FRANCIS MARION BLACK, JR., V. THE STATE.

No. 20198. Delivered March 22, 1939.
Rehearing Denied May 31, 1939.

The opinion states the case.

*A. E. Owens,* of Alpine, *Wallace Hughston,* of McKinney, and *Mae M. Ament,* of Alpine, for appellant.

*Alan R. Fraser,* District Attorney of Alpine, *Roy D. Jackson,* District Attorney of El Paso, and *Lloyd W. Davidson,* State's Attorney of Austin, for the State.

KRUEGER, Judge.

The offense is murder; the punishment assessed is death.

Appellant's first contention is that the court erred in overruling his motion to quash the indictment on the ground that it charged no offense against the law of this State. The indictment, omitting the formal parts, reads as follows: "* * * That on or about the 9th day of June, A. D. 1938, and anterior to the presentment of this Indictment, in the County and State aforesaid, Francis Marion Black Jr. and Guinevere Kerns Black did, then and there unlawfully, voluntarily, and with malice aforethought, kill Marvin Dale Noblitt by shoving him from a cliff * * * against the peace and dignity of the State."

Appellant contends that the indictment merely charges that he killed deceased by a *shove.* We cannot agree with him. The *shove* was not the only means charged by which the offense was committed; it was only one of the elements included in the means employed to accomplish the homicide. The *shoving* of the deceased *from a cliff* is what produced deceased's death. Consequently the *cliff* is one of a combination of means alleged by which the offense was committed. It is analagous to the shoving of a person from a house, tower, or precipice, so that he would fall to the ground below. The shoving and the falling was not the only means which caused death, but the sudden impact upon hitting the ground below would enter into it. These, however, are merely the natural and probable conse-

quences which follow and flow from shoving the intended victim off the cliff or precipice. Appellant asks: "What killed Marvin Dale Noblitt?" What would have killed him if he had shot the deceased with a rifle. Not the pulling of the trigger, not the powder that forced the bullet through the air, but the bullet that entered the body and tore, broke and ruptured vital organs of the body.

Should it, therefore, be necessary that the indictment charge that appellant shot the deceased with a rifle loaded with powder and lead; that the powder exploded when the trigger was pulled, which in turn sent the lead missile through the air with great force and caused it to enter the body of the deceased and break and rupture vital organs in the body of the deceased from which he died? We think not under our present system of criminal pleading.

If the acts constituting the offense are charged, it is ordinarily sufficient. What, then, are the acts charged in the instant case which constitute the offense? Not the *shoving*, but .the *shoving off the cliff;* that being done the result which followed was but the natural consequences of the act. Consequently, the only act that was necessary to be charged was the act of appellant which set in motion the death dealing blow to the deceased. A mere shoving of the deceased would not and did not produce his death. But the shoving from the cliff so that he fell a great distance to the ground below, striking rocks did produce his death.

Appellant, relying on the case of Middleton v. State, 25 S. W. (2d) 615, asserts that if the death of the deceased had been produced by poisoning, this Court would not hold an indictment sufficient which merely charged that the accused poisoned the deceased. This may be true, because such a charge would be the statement of a conclusion and not the statement of any fact. Moreover, Articles 1197, 1198 and 1199 P. C., set forth several ways by which the offense of murder by poisoning may be committed. Unless an indictment charged one of these ways as specified in the statutes, it would be clearly insufficient in law. That is so by reason of the statutes. The following pertinent language is noted in the case of Middleton v. State, supra:

"The articles above quoted (Arts. 1197, 1198, 1199 P. C.) set forth several ways by which the offense of murder by poisoning may be committed. For example, under Article 1197, supra, the offense may be committed by mingling the poison with food, drink, or medicine, or by poisoning, or causing to

be poisoned, a spring, well, cistern, or reservoir of water. Under Article 1198, supra, the offense may be committeed by causing another to inhale or swallow poison, or by administering poison to another. The indictment fails to particularize the acts complained of. It merely charges in general terms that appellant committed the offense of murder by poisoning the deceased with strychnine. Whether the strychnine was administered by appellant to deceased, or whether appellant was charged with mingling such poison with the drink, food, or medicine is not averred. As far as the allegations of the indictment are concerned, the manner in which appellant poisoned deceased is a matter of conjecture."

In the instant case, however, the indictment charges the manner and means by which appellant committed the offense.

In the case of Huddleston v. State, 156 S. W., 1168, also relied on by appellant, we find that the indictment under which appellant was convicted charged him with killing the deceased by stabbing him with a sharp instrument. Said indictment was attacked as being insufficient on the ground that the simple allegation of stabbing him with some sharp instrument was not a sufficient designation of the instrument used. The court sustained this contention on the ground that where the instrument used is unknown to the grand jury, or cannot be obtained by reasonable diligence, then it is incumbent upon the State to allege, in addition to the fact that it was a sharp instrument, that a further description thereof was unknown to the grand jury.

It is a well-known rule of criminal pleading that where the offense is alleged to have been committed with an instrument, such instrument must be named or described in the indictment, or it must be charged that the instrument used was unknown to the grand jury. However, in the instant case, the indictment charges the manner and means by which the offense was committed—i. e. the pushing of the deceased off the cliff.

Having reached the conclusion that the indictment was sufficient, we deem a further discussion thereof unnecessary, since it would only tend to lengthen the opinion and serve no useful purpose. It might be noted, however, that when the case was called for trial, the State dismissed as to appellant's wife, and proceeded with the prosecution against appellant alone.

Here, as in the court below, the appellant challenges the sufficiency of the evidence to establish the corpus delicti. To our minds, this presents the most serious question in the case. In order to convict for a homicide, it is necessary that the

evidence show the corpus delicti. To do so, the State is required to prove by facts or circumstances, or by both, three necessary elements: (1) That the body of the deceased was found and identified. (2) That the death of the deceased was caused by the criminal act or agency of another, and (3) that the accused is connected with that criminal act or agency.

The death of the deceased and the identification of the body is shown beyond any question. The only difficult question to be determined is the sufficiency of the evidence to show that his death was produced by the criminal act or agency of the appellant. While it is true that appellant made a written confession of his guilt in which he stated that he had shoved the deceased from the cliff, this standing alone is not sufficient in the eyes of the law. However, such confession may be used in aid of other facts and circumstances to establish the corpus delicti. Said facts and circumstances may include the physical or external appearance of the body of the deceased, marks of violence thereon, if any, and all of the surrounding facts and circumstances at or subsequent to the commission of the alleged offense which would tend to negative the supposition or hypothesis that the act could have been the result of natural causes or accident.

We will, therefore, state the substance of the evidence adduced upon the trial as the same appears from the record, and then apply the rules of law to these facts to determine the sufficiency thereof.

It appears from the record that appellant was reared and educated in the State of Kansas; that he finished his education at the University of that State. In the year 1934, appellant and his wife were married in Dallas, Texas. After their marriage, they returned to Kansas, where he induced her to invest some money in stocks. This business venture resulted in a loss of money and he decided to retrieve these losses in some manner. He conceived the idea of adopting a boy, insuring his life, making himself the beneficiary, and then causing the insured to meet his death in such a manner that it would appear to be due to an accident. With that object in mind, he made inquiry of two insurance companies in the State of Kansas concerning insurance on the life of a boy he had taken to rear, and whom he intended to adopt. He asked for $50,000.00 but was informed that he could not get a policy in excess of $5,000.00 on a child under 15 years of age. He and his wife then came to San Benito, Texas, where he opened up a radio repair shop. While thus engaged, he made inquiry about some boy 12 or 13 years of age whom he might adopt. He was put in touch with the

mother of the deceased. He told her that he expected to go to San Antonio and open up an ice cream parlor and desired to adopt a boy who would be willing to work before and after school hours in his prospective place of business. The mother, at that time, declined to permit the adoption, but did agree that she would allow him to have the boy for a period of six months. That if the boy were satisfied after such period, the question of adoption might then be discussed further. Appellant and his wife left Harlingen, Texas on the 2nd day of April, and arrived in San Antonio the next day. A few days later, he made an application to the Acacia Insurance Company for a policy of $5,000.00 on the life of the boy. He took him to the office of Dr. Jackson in San Antonio, who examined him. The insurance company declined to accept the application and so notified appellant. An application was then made to the Great American Insurance Company in San Antonio for a policy of $5,000.00 on the boy's life. In said application, appellant stated that he had had the boy eight months; that he had obtained him from an orphanage in Oklahoma. That the boy was then living with appellant's people in Dallas. The policy was issued on or about May 29, 1938, in the amount applied for, and made payable to the appellant as beneficiary. Within three or four days, appellant disposed of his filling station in San Antonio which he had recently acquired, packed his worldly goods in an automobile, and started with his wife and the boy for West Texas. They arrived in Alpine on June 8, and the following morning appellant went to a local drug store where he inspected some post cards and made inquiry concerning the Grand Canyon, the mountain scenery and places of interest for one hundred miles around. The druggist had no post cards showing pictures of the Grand Canyon and advised appellant to go to the Chamber of Commerce. There appellant made inquiry concerning the Limpia, the Grand, and the Santa Helena Canyons. The girl in the office gave him information relative to the scenic beauty of the country, and told him about Agua Frio Springs, located at the foot of a 400 foot cliff which had paintings thereon made by Indians many years ago. On the same day, appellant appeared at the village of Terlingua, where he made inquiry and was given information concerning the location of Agua Frio Springs.

Mr. Worthington, on whose ranch the Agua Frio Springs are located, testified that said springs were located at the foot of a cliff, approximately 400 feet high, the top of which slightly leans over and faces west. He further testified that on June 9 about 5 P. M. appellant, accompanied by his wife and a child,

appeared at his home and asked for permission to look at the springs, the bluff, and the scenery. The request was granted, and in a very short time, the witness saw two people on top of the cliff rolling stones off into the canyon. That some thirty minutes later, appellant came back to the ranch house and reported that his little boy had fallen off the cliff and was injured. Mr. Worthington took his truck, drove to the scene of the unfortunate occurrence, and brought the mangled body of the boy back to the ranch house, from whence it was later taken to Alpine to an undertaker. Appellant told the undertaker that. the deceased's name was Marvin Dale Noblitt. That he had adopted the boy in fact but had not yet gone through the necessary legal formalities. He stated that he had obtained him in Oklahoma and had had him about a year. He asserted that he did not know where the boy's mother was and did not think he could ever find her. That there was no necessity for delaying the interment. He stated that he had but little money and asked the undertaker if he could collect some insurance. That he had a policy on the life of the boy in the sum of $5,000.00.

After the funeral appellant and his wife were taken into custody by the sheriff; placed in jail and charged with the homicide. Two days after the alleged homicide, appellant made a written confession in which he admitted the killing. He stated that he went to the top of the cliff with the boy and threw a few rocks off, and then shoved the boy off the cliff. The confession is similar, in practically every respect, to the facts proved by the State from other sources. Consequently, we see no need in reiterating its content.

From the evidence offered by the State, independent of appellant's confession, there seems to be no doubt that the accused had formed, and planned to carry out, the crime for which he was on trial. Proof of motive is abundant to support the jury's belief that when appellant went with the deceased to the mountain top, he had in mind killing the boy for the insurance, and entertained such intention at the time they reached the top of the cliff. But as above indicated, the question raised is, have we, in the evidence, and independent of appellant's confession, sufficient proof that the deceased was *pushed* from the cliff by appellant, and did not fall as the result of an accident or otherwise? Such independent proof is required by the law to establish the corpus delicti. Where, as in this case, there are no eye-witnesses to the crime, the hypothesis of accidental death must be overcome by extraneous proof showing the commission of an offense. The authorities are uniform that

this can be ·shown by circumstances, and these circumstances must necessarily occur at the time or after the commission of the offense in order to show that the death was caused by a criminal agency. The circumstances occurring before the act would only tend to show motive, and would in no way show that the death of the deceased was brought about by any criminal act or agency.

What conduct have we, here, if any, on the part of appellant occurring at or after the deceased's death which would indicate that he pushed the boy off the cliff? Stated another way, what subsequent acts or conduct on the part of appellant would negative the hypothesis of accidental death? It is not necessary that said conduct or circumstances standing alone be sufficient to show an offense. It is only necessary that sufficient circumstances be in evidence from which the jury could decide that a criminal act had been committed.

The facts show that as soon as appellant had obtained the policy on the deceased, he sold his filling station and went to West Texas with his wife and the deceased. When he reached Alpine, he immediately made inquiry about the mountains and their location. As soon as he had obtained the desired information he started for the cliff. Within a few minutes after he arrived there, and as soon as he had gotten out of the car, he ascended the cliff with the boy, and within thirty minutes had made his way back to the ranch house to tell of the boy's death. No time seems to have been spent in looking around at the springs and other scenery, and no good reason is advanced as to why he should wish to hurry to the top of the cliff. As indicated, however, these facts alone do not show that deceased did not accidentally die.

It occurs to us, however, that if the boy had *fallen* from the cliff, there would have been no need for appellant to have told a lie to the undertaker about how long he had had the boy, where he had obtained him, or that he did not know the boy's mother or her whereabouts, when he knew she lived at Harlingen. This is not evidence of motive for the commission of the offense, but evidence tending to show concealment of a crime already committed. Why tell a lie if there was no reason for it? As a rule, people who tell lies have reasons for so doing, and the reason generally, in cases of this nature, is to conceal and cover up the truth relative to their acts and conduct. Furthermore it is shown that appellant wanted the body buried as quickly and as quietly as possible. Why?—To conceal and suppress every fact and circumstance which might furnish a clue leading to a disclosure of his unlawful connection with

the death of the deceased. The searching mind, seeking to discover the cause for such false statements and conduct, is irresistably led to the conclusion that they were prompted by a guilty conscience. Consequently, we have evidence of a guilty conscience, (a motive for the concealing of an offense), plus a motive for the commission of the crime. To aid these, we may look to the confession, which may be used to aid in the proof. See Harkey v. State, 234 S. W., 221 (224) and the authorities there cited.

From all of the facts and circumstances it appears that appellant planned to mulct an insurance company by murdering a boy upon whom he expected to obtain insurance payable to himself, and in pursuance of said plan, he obtained the insurance and committed the offense as charged.

In the case of Lott v. State, 131 S. W. 553, this Court, speaking through Judge McCord, and discussing a similar question, said: " '* * * The general doctrine is that extrajudicial confessions, standing alone, are not sufficient proof of the corpus delicti; and some of the cases hold that the corpus delicti must be proved independently of confessions. But we do not understand such to be the better doctrine. In other words, in the establishment of the corpus delicti the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence. * * *' "

The case also quotes with approval the following excerpt taken from 4 American and English Encyclopedia of Law, p. 309, as follows: " 'When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. Full proof of the body of the crime, the corpus delicti, independently of the confessions, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient.' "

Under all the facts and circumstances, we feel that the corpus delicti has been sufficiently established. See Kugadt v. State, 38 Texas Crim. Rep., 681; 44 S. W., 989; Wilganowski v. State, 180 S. W., 692.

At the trial, appellant repudiated his confession and interposed a plea of insanity. This issue was submitted to the jury by a lengthy instruction. No objection was made to same at the time. Consequently appellant can not now be heard to complain unless the court committed fundamental error in his instruction to the jury on the subject. See Art. 658 C. C. P. We have, how-

ever, carefully examined the entire charge in view of his contentions, but fail to find any error therein which would cause a reversal of this case.

By bill of exception number one, appellant complains of the introduction in evidence of his written confession, on the ground that the State did not have sufficient evidence to permit its introduction and no proper predicate had been laid therefor. The sheriff, to whom the confession was made, testified to having given appellant the necessary legal warning before the confession was made. Moreover, the written confession upon its face shows that the warning was given as required by the terms of Art. 727 C. C. P. Consequently there was no error in admitting it in evidence.

Moreover, the court, in his charge to the jury, instructed them that unless they believed from the evidence that the defendant was properly warned and that after being so warned he voluntarily and without persuasion, coercion or promise of immunity of any kind, made the statement introduced in evidence; and unless they so believed, or if they had a reasonable doubt thereof, they should disregard such statement and all parts thereof and consider the same for no purpose and acquit the defendant.

Thus it will be seen that the court submitted the question of whether the necessary statutory warning had been given to appellant prior to the time he made the confession, and also the question of whether the same was voluntarily made. This was all he was entitled to. Hence his contention is overruled.

By bills numbers two, three and four, appellant complains of the introduction in evidence of a number of applications for insurance upon the life of the deceased and the medical examiner's report. The objection urged thereto was that appellant had no insurable interest in the life of the deceased. We think this evidence was admissible to show motive for the commission of the offense charged. Whether appellant had an insurable interest is not the question. The question is did he *think* he could collect the insurance after the policy had been issued.

All of the various matters complained of by appellant have been very carefully considered by us, but in none of them is error of a reversible nature presented.

The judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has

been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

On account of the insistence of appellant's attorneys, and the gravity of the punishment, we have again reviewed not only the record, but have also carefully read all briefs filed in this case.

We recognize the strength of the contention relative to the indictment in which it is charged that the means of death employed by the appellant was a "shove from a cliff," but remain of the conclusion that such is fully descriptive of the method by which the grand jury thought the death of the boy was caused, and a proper notification thereof to the accused. Mr. Webster says that a cliff is "a high, steep rock, a precipice." Again he says a precipice "is a headlong steep, a very steep perpendicular or overhanging place, an abrupt declivity, a cliff." It therefore appears that appellant is charged with encompassing the death of the deceased by shoving him off a very steep overhanging place. We think this is as far as the State should be required to go in describing the manner that appellant caused the death of the deceased. That the shoving caused the body to fall and be dashed to pieces on the rocks below was but a necessary concomitant of the violence that was initiated by the push, and we think it was no more necessary to allege the different stages that took this boy's life than it would have been to allege the crushing of the skull, the exposure of the brain, the final effect thereof on the heart, and the eventual disintegration of the life force. The push over the cliff was the active agency that eventuated in the destruction of life, and the sequelae that followed such push, were but the natural and probable consequences of such act. We think the indictment sufficient.

Complaint is again made on the ground that the body of this crime is only established by means of the confession alone, and therefore that the State has failed to make out a proper case herein. The Kugadt case, 38 Texas Crim. Rep. 681, is the leading case on this proposition, and Judge Hurt went into this matter exhaustively, and therein lays down the doctrine that although an extrajudicial confession alone is not sufficient to establish the corpus delicti, such confession can be used in aid of its establishment, and if there be extrinsic corroborative circumstances as will, taken in connection with the confession,

produce conviction in the minds of the jury, such will be sufficient; and such extrinsic evidence need not be conclusive in its character. Also see Jackson v. State, 16 S. W. Rep. 247.

That the deceased was Marvin Dale Noblitt there can be no doubt; that he met his death by violence can not be denied, such violence being either accidental or intentional, leaving to be established by proof but one further fact, and that is, did he accidentally fall, or was he pushed from this cliff? We find the appellant interested in obtaining a boy upon whose life he could fasten an insurance policy, payable, in the event of death, to the appellant; we find him in final possession of the boy, and an executed insurance contract, seeking a place where an intentional death for the boy could be provided, and a contention, at least probable, could be made relative to such death being accidental; we find his inquiries relative to certain localities, at which localities such an accidental death could be made to seem probable; we find him in the place where such an end was made of the boy, according to his testimony given on the trial; and we find him present at the actual scene as the boy plunged to his death; we find his vague and contradictory statements, many of them untrue, made just after the tragedy; his unseemly haste to dispose of the broken body, and an effort to collect the reward for this untimely death,—all of which are strong circumstances going to corroborate the statement made in the confession, that he shoved or pushed him off the cliff, and caused his body to fall on the rocks below. We think the criminal agency and connection of the appellant with the causing this boy to fall off this cliff is satisfactorily shown by such circumstances, aided as they are by his confession.

Appellant again complains of the court's charge on insanity, and also because of the jury's finding that appellant was sane. The charge on insanity is rather lengthy, and possibly more favorable to the appellant than it was entitled to be, nevertheless it embodied the basic principles laid down by our law, and finally was bottomed on the appellant's ability to know the nature and consequences of his act, and the distinction between the right and the wrong thereof. Unquestionably there was testimony upon which the jury could have found the appellant to have been weak-willed, moody at times, with fanciful and impractical ideas, with a historical background of a probable diseased heritage, if such there be, but never was his defense able to rise to the dignity of an inability to distinguish between the right and the wrong of the contemplated act; at

no time did his own testimony rise any higher than the fact of his abnormalities, not sub-normalities. It was shown that he was educated in letters as well as skilled in mechanics; that he had been the recipient of society's bounty in training the mind and body for a useful life, which training but served, if the State's case is to be believed, in causing him to depart from the standards of conduct laid down by such society, and to mold his life away from the normal standard fixed for law-abiding members thereof. Such failure upon the part of this appellant may have been the cause of this extreme penalty, or again the long preparation, the deliberation, and the circumstances surrounding the tragedy may have caused the jury to have demanded from him a return on the larger talents rather than of the one talent wrapped in a napkin and buried in the ground.

It is worthy of note that appellant's tendencies toward insanity' alone were testified to, his testimony never rising to the dignity of denominating him as an insane person without the knowledge of right and wrong. It is true that the offense proven before the jury may have evidenced a crime of peculiar horror, and an ingenuity that would tax the mental capacity of a normal person, but all our observation and information teach us that crime itself is not normal,—nor the act of a normal person. It takes either sub-normality or abnormality to foster criminal ideas and bring them to their fruition, and neither of such characteristics necessarily fall within the required measure in order to denominate the subject thereof an insane person. The State's witnesses found the appellant to be possessed of mental faculties that show him to be sane under the law, and the appellant's own testimony on the stand evidently had much to do with the jury's final decision that he knew it was wrong to take a human life.

We remain fixed in the views expressed in our original opinion herein, and overrule this motion.