

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0320-13

---

### ARNOLD CARRIZALES, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### BEE COUNTY

---

**COCHRAN, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

Appellant was convicted of the Class B misdemeanor of criminal mischief for "throwing screws and nails into the road causing flat tires." On direct appeal he argued that the evidence was insufficient to establish the *corpus delicti* of the offense of criminal mischief, *i.e.*, that the damage to the tires was the result of criminal activity. The court of appeals disagreed–stating that proof of appellant's motive and the physical evidence combined "allowed a rational fact finder in this case to conclude that the State had

established the *corpus delicti* of criminal mischief."[1]  We granted review to clarify that the common-law *corpus-delicti* rule exists, in the post *Jackson v. Virginia*[2] era, only in confession cases.  Because the circumstantial evidence was sufficient under *Jackson v. Virginia* to prove that appellant committed the crime of criminal mischief, we affirm.

I.

The evidence at the bench trial showed that appellant lives on a quiet county road.  His cousin, Ramona Gomez, lives a little farther down that county road, on a private drive.  At the very end of the road is an operating oil well.  Both appellant and Mrs. Gomez testified that, in late 2009 and early 2010, no one else lived off that road.  The only other vehicles on the county road were the eighteen-wheelers "going up and down from the oil well."

Mrs. Gomez and her husband had to drive past appellant's property to go anywhere.  Appellant wanted the Gomezes to stop speeding on the county road, so, in 2009, he put some large tree stumps on the road, beyond his residence but before the Gomezes's private drive, "[t]o slow them down[.]"  Mrs. Gomez testified that when she confronted appellant about the stumps, "He said maybe he did or maybe he didn't [put them there], because we were driving too fast down the road, and that we needed to slow down."

Later, Mrs. Gomez tried to invite appellant to her husband's birthday party, but he rebuffed the invitation, telling her she should not be on his property.  At some point, Mrs.

---

[1] *Carrizales v. State*, 397 S.W.3d 251, 256 (Tex. App.—Corpus Christi 2013).

[2]  443 U.S. 307 (1979).

Gomez stopped letting her children go play on appellant's property. Then, in late 2009 and early 2010, she and her husband started getting flat tires–all caused by the same distinctive type of metal roofing screw.[3] Her husband got screws in all four of his already-worn tires, and he had to replace all four tires. Mrs. Gomez had to replace two fairly new tires. The Gomezes didn't think twice about the first couple of flat tires, but as the flats started stacking up–all caused by the identical, distinctive type of screw–they suspected that appellant had scattered the screws on the county road intending to damage their tires as they drove to and from their home. Mrs. Gomez finally called the sheriff's office on February 28, 2010. When Deputy Jennifer Lopez came out to talk to Mrs. Gomez, she, too, got a flat tire caused by identical metal roofing screws in her tire.

Bee County Sheriff's Office Investigator Steve Linam talked to appellant twice about the problem, and each time he denied putting the screws in the road.[4] Investigator Linam said he did not search appellant's property, and he did not drive far down the county road, for fear of getting a flat tire also: "I drove out to the location. I looked in the immediate area

---

[3] An exhibit with pictures of the metal roofing screws show that they all have wide, flat heads, a long, narrow screw ending in a sharp point, with a washer that butts against the flat head to ensure that the screw will prevent water from seeping through the metal roof. This type of screw can be balanced on its head with the sharp point facing upward.

[4] Investigator Linam testified,
In speaking with Mr. Carrizales, he denied throwing screws in the roadway and said that he never did that. He said he doesn't like the people that live [past] him down the road, and then he called me again the following day, and this time he got irate and he said he was going to call the big boss and get me in trouble for investigating him, and he says he doesn't do things like this, and [then] he again said that he doesn't like the people that live up at the end of the road [past] him.

[past] his driveway.  I didn't see any [roofing screws], but I did not go all the way down the road because I didn't want to end up with flats on my car."

At trial, appellant denied scattering screws on the county road, but he admitted placing the tree stumps in the road.  He said that the screws must have gotten on the county road "accidently."

The trial judge found appellant guilty of the charged offense and sentenced him to thirty days in jail, suspended for one year.  On direct appeal, appellant argued that the evidence was insufficient to prove that the screws ended up in Mrs. Gomez's tires because of *anyone's* intentional or knowing act, much less his own.[5]  But the court of appeals held that the evidence established both (1) the *corpus delicti* of the offense of criminal mischief, and (2) appellant's identity as the person who committed the crime.[6]  We granted appellant's petition, which attacks only the first holding–that the evidence was sufficient to prove the *corpus delicti* of the offense.

## II.

The *corpus delicti* rule is a common law, judicially created, doctrine–the purpose of which was to ensure that a person would not be convicted based solely on his own false

---

[5] We granted review of this question:  "Can a conviction for a crime involving property damage stand when there is no evidence whatsoever that the damage was caused by a person's intentional act?"

[6] *Carrizales*, 397 S.W.3d at 256-57.

confession to a crime that never occurred.[7]  Although the exact origin of the *corpus delicti*

rule is not known, its history traces back to at least the 17th century in *Perry's Case,* which

refutes "the layman's assertion: 'he would never have confessed unless he was guilty.'"[8]  In

that case, Harrison set off to collect rents but failed to return.  Perry, a servant, was sent to

search for him, but he too failed to return.  Perry was found, and so was Harrison's "hat and

comb 'being hackt and cut, and the band bloody.'"[9]  Perry was a natural suspect, and he soon

confessed, implicating not only himself, but his brother and mother in the murder as well.

A few years after the three Perrys were executed for this "murder," Harrison reappeared, very

much alive.[10]  Thus was born a common-law requirement originally restricted to the case of

homicide: "a party accused of homicide ought not to be convicted on his own confession

---

[7] *See Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002) ("The *corpus delicti* rule guarded against the shocking spectacle and deleterious effect upon the criminal justice system when a murder victim suddenly reappeared, hale and hearty, after his self-confessed murderer had been tried and executed .") (citing ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 142–50 (3d ed.1982)); *see also Warszower v. United States*, 312 U.S. 342, 347 (1941) ("The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone."); *East v. State*, 175 S.W.2d 603, 605 (Tex. Crim. App. 1942) ("The wisdom of this rule lies in the fact that no man should be convicted of a crime, the commission of which he confesses, unless the State shows, by other testimony, that the confessed crime was in fact committed by someone. The contrary would authorize a return of conditions that existed in the days of the inquisition.").

[8] ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 143 (3d ed. 1982) (citing *Perry's Case*, 14 How. St. Tr. 1312, 1661 (1660)).

[9] *Id.* at 142.

[10] *Id.*; *see Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. PA. L.REV. 638, 639 (1955) ("This and similar cases led the British courts to question the sufficiency of confessions to prove that a crime had been committed.").

merely, without proof of the finding of the dead body of evidence *aliunde* that the party alleged to have been murdered is in fact dead."[11]

In discussing the rule requiring corroboration of a defendant's extrajudicial confession, Dean Wigmore explained the meaning of the term *corpus delicti*.  He noted that proof of guilt for a criminal offense may be divided conceptually into three parts:

> first, the occurrence of the special kind of injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing); secondly, somebody's criminality as the source of the loss,–these two together involving the commission of a crime by somebody; and, thirdly, the accused's identity as the doer of this crime.[12]

The first two parts—the occurrence of the injury or loss, and its causation by criminal conduct—were termed the *corpus delicti*.  The third element, the identity of the accused as the offender, was not considered part of the *corpus delicti* because he, of course, had already confessed to the crime.[13]  The sufficiency of the evidence corroborating the defendant's

---

[11] 3 JOHN HENRY WIGMORE, A TREATISE ON THE SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW § 2070 at 2779 (1904) (quoting Fitzgerald, J., in *R. v. Unkles*, Ir. R. 8 C.L. 50, 58). Texas, in the 1925 Penal Code, added a protection against this very scenario. Article 1204 of that code, entitled, "Body of deceased must be found," provided, "No person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed." That statute was expressly repealed by the Legislature in 1974. *See Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993).

[12] WIGMORE, *supra* note 11 § 2072 at 2782.

[13] *See, e.g., Self v. State*, 513 S.W.2d 832, 837 (Tex. Crim. App. 1974) (the *corpus delicti* of murder is composed of proof that a person's body has been found and proof that the person died by the criminal act of another; proof that the defendant "was the guilty agent" in causing the victim's death may be established solely by his extrajudicial confession; "All cases heretofore holding that the corpus delicti in a murder prosecution consists of three elements are hereby overruled to the extent they are in conflict with this opinion.").

extrajudicial confession was assessed by determining whether the State had offered some

independent evidence of the *corpus delicti*.[14]  Under the common law, the *corpus delicti* rule

"concerns the usability in a criminal case of a confession made by the defendant outside of

court."[15]  The policy of the rule was widely criticized by Dean Wigmore and others,[16] and it

did not apply in any other context.

The old *corpus-delicti* "usability" rule has, however, been superceded by the due-

process "sufficiency of the evidence" model set out in *Jackson v. Virginia*.[17]  *Jackson* is the

---

[14] WIGMORE, *supra* note 11 § 2073 at 2784; *see, e.g.*, *Black v. State*, 128 S.W.2d 406, 410-11 (Tex. Crim. App. 1939) (upholding defendant's murder conviction and death sentence as there was sufficient proof of the *corpus delicti* that the victim died from the criminal act of being shoved off of a cliff so that defendant's confession could be considered).

[15] PERKINS & BOYCE, *supra* note 8 at 140.  The authors set out the doctrine as follows:
> The corpus-delicti rule is that no criminal conviction can be based upon the defendant's extrajudicial confession or admission, although otherwise admissible, unless there is other evidence tending to establish the corpus delicti.

*Id.* at 142.

[16] WIGMORE, *supra* note 11 § 2070 at 2779.  Wigmore explained,
> No one doubts that the warning which [the *corpus delicti* rule] conveys is a proper one; but it is a warning which can be given with equal efficacy by counsel or . . . by the judge in his charge on the facts.  Common intelligence and caution, in the jurors' minds, will sufficiently appreciate it, without a laying on of the rod in the shape of a rule of law.  Moreover, the danger which it is supposed to guard against is greatly exaggerated in common thought.  That danger lies wholly in a false confession of guilt.  Such confessions, however, so far as handed down to us in the annals of our courts have been exceedingly rare.

*Id*.  Dean Wigmore noted that such a rule might be merely superfluous, but "this rule, and all such rules, are to-day constantly resorted to by unscrupulous counsel as mere verbal formulas with which to entrap the trial judge into an error of words in his charge to the jury."  *Id.*

[17] 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (stating that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").

only constitutional standard of review for assessing the legal sufficiency of evidence in a criminal case.[18]  Under that standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[19]  It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be sufficient to establish guilt.[20]  The *Jackson* standard was established to give appellate teeth to the due-process right established in *In re Winship*: "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof–defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."[21]

The application of the *corpus-delicti* rule as it applies to convictions based on extrajudicial confessions has survived the *Jackson v. Virginia* due-process sufficiency review in Texas.[22]  As we stated earlier this year,

---

[18] *Brooks*, 323 S.W.3d at 895.

[19] *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d 895

[20] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[21] *Jackson*, 443 U.S. at 315-320 ("In [*In re Winship*, 397 U.S. 358 (1970)], the Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'").

[22] *Salazar v. State*, 86 S.W.3d 640 (Tex. Crim. App. 2009).  Though Texas has held onto the common-law rule, many states have jettisoned it.  *See People v. LaRosa*, 293 P.3d 567, 573-74

When the burden of proof is "beyond a reasonable doubt," a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the *corpus delicti*. The *corpus delicti* doctrine requires that evidence independent of a defendant's extrajudicial confession show that the "essential nature" of the charged crime was committed by someone.[23]

Appellant notes that we have occasionally applied the *corpus delicti* rule in cases that did not involve extrajudicial confessions.[24]  In *Bussey v. State*,[25] we relied upon an earlier case, *Zepeda v. State*,[26] in holding that the State failed to establish the *corpus delicti* of the

---

(Colo. 2013) (abandoning the *corpus delicti* rule in favor of the trustworthiness standard).  In *LaRosa*, the Colorado Supreme Court  noted,

> The rule has been criticized for inadequately serving its admittedly "limited function." It exists to detect false confessions but does so in only one circumstance: when a person confesses to an imaginary crime. It does nothing to protect a person who confesses to a crime committed by someone else. Courts have questioned the logic of that distinction. The rule has also been criticized as outdated. Since its inception, the United States Supreme Court has recognized additional constitutional and procedural safeguards concerning the voluntariness of confessions that have led some courts to question whether the rule is obsolete. Additionally, since courts first began applying the corpus delicti rule, criminal statutes have become more numerous and complex, making the corpus delicti difficult, if not impossible, to define for certain crimes.

*Id.* (citations omitted).

[23] *Hacker v. State*, 389 S.W.3d 860, 865-66 (Tex. Crim. App. 2013).

[24] Appellant cites *Duncan v. State*, 7 S.W.2d 79, 80 (Tex. Crim. App. 1928), but in that case, the defendant's arson conviction relied upon his extrajudicial confession, thus the common-law *corpus delicti* rule requiring corroboration applied.  *See also Adrian v. Stat*e, 587 S.W.2d 733, 734 (Tex. Crim. App. [panel Op.] 1979) (in an arson case that relies on a defendant's confession, State must prove "that a crime has been committed"; that is, under the *corpus delicti* rule, the State must prove the structure was intentionally set on fire by someone); *Troncosa v. State,* 670 S.W.2d 671, 680 (Tex. App.–San Antonio 1984, no pet.) (citing *Bussey* and applying *corpus delicti* rule in arson case that relied on defendant's extrajudicial confession).

[25] *Bussey v. State*, 474 S.W.2d 708, 710 (Tex. Crim. App. 1972).

[26] 139 S.W.2d 820 (Tex. Crim. App. 1940).

offense of arson–that is, the fact that the fire (the loss) was "of incendiary origin" (was the result of somebody's criminality). But, in *Bussey,* we apparently did not notice that *Zepeda's conviction* relied on the defendant's extrajudicial confession, and thus we properly applied the *corpus-delicti* rule requiring corroboration of that confession.[27]   It appears that we mistakenly applied the *corpus-delicti* rule in *Bussey*, a case that did not involve an extrajudicial confession, and we thereby confused the bench and bar.

At any rate, *Bussey* was decided several years before the *Jackson v. Virginia* sufficiency standard was adopted, and proof of the *corpus delicti* in non-confession cases is wholly subsumed by the *Jackson* elements test. If the State proves each element beyond a reasonable doubt, there is no doubt that the crime has been committed by someone, namely the defendant. Because this case does not involve a defendant's extrajudicial confession, there is neither need nor purpose to refer to the *corpus-delicti* doctrine. Mention of the *corpus-delicti* doctrine in a *Jackson* sufficiency review when the case does not involve a confession is, at best, just short hand for "evidence that the crime has been committed," and, at worst, confusing.[28]  Such confusion is apparent in appellant's main argument that the court of appeals inappropriately "conflated identity with *corpus delicti*." The State did not have to prove any *corpus delicti*, it had to prove every element of the criminal-mischief offense

---

[27]  *Id.* at 821 ("There is no evidence, independent of the confession, that the fire was of incendiary origin.").

[28]  *See, e.g., Mosher v. State*, 901 S.W.2d 547, 549 (Tex. App.–El Paso 1995, no pet.) (mentioning the *corpus-delicti* rule in an arson case that did not involve an extrajudicial confession, but properly applying the *Jackson v. Virginia* sufficiency analysis).

beyond a reasonable doubt.

III.

A person commits criminal mischief if, without the effective consent of the owner he intentionally or knowingly damages or destroys the tangible property of the owner.[29] The court of appeals emphasized four pieces of evidence in holding that the State proved that appellant intentionally or knowingly damaged or destroyed the Gomezes' tires:

*       Appellant admitted that he had an ongoing conflict with the Gomezes over the speed at which they drove past his house on the county road.

*       Appellant admitted that he had placed logs in the roadway in an attempt to slow the Gomezes down, but that the logs had not curbed their speeding.

*       Mrs. Gomez stated that she had lived off the county road for some 30 years, and had never, until this dispute arose with appellant, encountered hazards on the road.

*       The patrol officer who went to the Gomezes' home to take the initial report ended up with a flat tire caused by the same type of roofing screws that caused the flat tires on the Gomezes's vehicles.[30]

Appellant acknowledges this circumstantial evidence as proof of both identity and that "the officer and Gomez drove on the same roads and that there were screws on that road," but says the evidence does not support an inference that criminality was the source of the loss, as opposed to accident.[31] He complains that the court "improperly conflated identity

---

[29] TEX. PENAL CODE § 28.03.

[30] *Carrizales*, 397 S.W.3d at 256.

[31] Appellant's Brief at 11-12. Appellant appears to argue that the State could not prove his guilt unless someone actually saw him tossing the screws out into the road. That is not the law. Circumstantial evidence is every bit as probative as eyewitness testimony and sometimes more

with *corpus delicti* . . . . [T]here was no appropriate reason for the court of appeals to include identity evidence in the *corpus-delicti* analysis."[32]  Au contraire.  The court of appeals, charged with deciding whether the evidence was legally sufficient, was entitled to consider the logical force of all the circumstantial evidence as it pertained to each element of criminal mischief–including criminal intent.  And we agree with the State that the Gomezes, the investigatory officers, and the trial judge could all reasonably apply Wigmore's "doctrine of chances" to these facts to conclude–beyond a reasonable doubt–that the tire damage in this case was caused by appellant's intentional act rather than by an inadvertent accident.[33]  "The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance."[34]

It is not every day that one gets a flat tire; it is more uncommon that the flat tires keep coming; and it is more uncommon still that they are all caused by the same distinctive and specialized roofing screw.  Mrs. Gomez, Mr. Gomez, and Deputy Lopez all had their tires

reliable.

[32] Appellant's Petition at 8-9.

[33] Appellant suggests that perhaps the screws could have fallen off of the oil trucks, but that suggestion ignores the fact that these are very distinctive screws that are designed solely for use in attaching metal roofs. There is no evidence that would support a finding that the oil company was building any metal roofed structures at their "gas pump" well at the end of the county road. There was no evidence of any other building or construction along appellant's road. Metal roofing screws do not, like "pennies from heaven," fall from the sky.

[34] *De La Paz v. State*, 279 S.W.3d 336, 347 (Tex. Crim. App. 2009) (citing 2 JOHN WIGMORE, EVIDENCE § 302 at 241 (Chadbourn rev. 1979)). As we noted in *De La Paz*, "Once is happenstance.  Twice is coincidence.  The third time it's enemy action."  *Id*. at 348 (quoting the James Bond villain Auric Goldfinger).

punctured by multiple identical roofing screws over a period of months–making it likely that they got them on the stretch of the county road beyond appellant's house but before the Gomezes's house, or on their private road.  Even appellant agreed that the only other traffic on any part of that stretch of road were the eighteen-wheelers driving to the well at the end of the county road–oil trucks with no known reason to be carrying metal roofing screws. And, perhaps most importantly, appellant admitted that he put logs in that very same stretch of road only months before to intentionally create an obstruction for the Gomezes and make them slow down.  This prior act of putting obstructions in the road with the intent to harm the Gomezes was strong circumstantial evidence rebutting the "accident" theory.

In *Drager v. State*,[35] for example, the defendant was prosecuted for criminal mischief for intentionally driving a tractor into a barn.  At trial, the defendant admitted damaging the tractor, but claimed that the collision was an accident; he testified that he saw the tractor going down the road without a driver; that he was being a good neighbor by trying to stop it.[36]  We held that the jury did not have to believe the defendant's "accident" explanation, and his admission that he was on probation for damaging a different tractor was a circumstance showing his intent to damage.[37]  As in *Drager*, the trial judge in this case was not required

---

[35] 548 S.W.2d 890 (Tex. Crim. App. 1977).

[36] *Id.* at 892.

[37] *Drager v. State*, 548 S.W.2d at 893. *See also Crawley v. State*, 513 S.W.2d 62, 64-65 (Tex. Crim. App. 1974) (defendant was convicted of willful injury to the personal property of another by means of a "staged" automobile collision; although he admitted being involved in the accident, the defendant denied any intent to willfully injure the property of the complainant, but evidence of six

to believe appellant's explanation that the roofing screws must have appeared on the county road "accidently," and the trial judge could find criminal intent from appellant's prior similar act of putting obstructions in the road to slow his neighbors down. We agree with the court of appeals that, although some testimony supported an inference that the Gomezes could have picked up the screws in their tires elsewhere, it was the trial judge's job to resolve the conflicting evidence, and he determined that appellant intentionally damaged property "by throwing screws and nails into the road causing flat tires."[38] We affirm the judgment of the court of appeals.

Delivered: December 11, 2013
Publish

---

other collisions was properly admitted to rebut the defensive theory of a lack of intent.); *Lincoln v. State*, 307 S.W.3d 921 (Tex. App.—Dallas 2010, no pet.) (trial court was free to disbelieve the defendant's story that she broke the glass in her child's father's front door accidentally; "Lincoln herself testified that she and Brooks had been in court a number of times concerning custody issues, the police had been called to Brooks's house when she was there, and Brooks had been violent toward her in the past. The trial court could have reasonably inferred Lincoln had become frustrated or angry when Brooks was not there with their son for scheduled visitation. There was also evidence that significant force would have been necessary to put a hole through the thick glass and to bend the metal support behind the glass.").

[38] *Carrizales v. State*, 397 S.W.3d 251, 256 (Tex. App.—Corpus Christi 2013); *see Geesa v. State*, 820 S.W.2d 154, 156–61 (Tex. Crim. App. 1991) (abrogating the alternative-reasonable-hypothesis construct).