**Opinion filed May 5, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00124-CR

_____

## CHUCK ROBERT HOLCOMB, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 13191-D**

## M E M O R A N D U M   O P I N I O N

The jury convicted Chuck Robert Holcomb of possession of methamphetamine with intent to deliver in an amount of four grams or more, but less than 200 grams—a first degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(d) (West 2017). Appellant pleaded "true" to one prior felony conviction alleged by the State for enhancement purposes. The trial court assessed Appellant's punishment at confinement for a term of twenty-two years in the Institutional

Division of the Texas Department of Criminal Justice. In one issue, Appellant contends that there is insufficient evidence to support his conviction. Specifically, Appellant asserts that, because of his service as a confidential informant, the State failed to establish that he was not lawfully in possession of the controlled substances. We affirm.

*Factual Background*

In January 2018, Appellant went to the Law Enforcement Center in Taylor County and asked to speak with Sergeant Wayne Cockerham of the Taylor County Sheriff's Department. Appellant explained to Sergeant Cockerham that he was experiencing money problems, and he wanted help getting his Mercedes out of impound. Appellant also wanted to become a confidential informant (CI). Sergeant Cockerham testified that it is rare for individuals to come forward and ask to become an informant, but he interviewed Appellant and determined that Appellant might be able to provide helpful information.

Sergeant Cockerham testified that he explained the risks of becoming a CI to Appellant and that he set out limits on Appellant's range of activity, including no use or sale of narcotics. Sergeant Cockerham testified that he always tries to limit his CI's interactions with narcotics because many of them have addiction problems. Instead of the CI making a direct purchase, he often has the CI set up a deal, report the location and time to law enforcement, and then never show up for the purchase. Sergeant Cockerham explained and discussed the dangers of working as a CI with Appellant. Appellant agreed that he did not want to be closely involved with transactions, testifying, or any official paperwork. Sergeant Cockerham further testified that he was clear in establishing that, while Appellant worked for him, Appellant (1) was not to participate in criminal activity unless law enforcement was directly involved and (2) did not have "free range" to act independently.

Sergeant Cockerham gave Appellant two advances for a total of $150, because he felt like Appellant "was going to be able to come through" with helpful information. A few days later, Appellant was able to set up a one-ounce buy of methamphetamine that resulted in a first-degree felony arrest. On two occasions, Appellant provided information that allowed law enforcement to locate four individuals with existing warrants.

Next, Appellant provided Sergeant Cockerham with information that someone had asked him to drive them to the Metroplex to purchase two pounds of methamphetamine. At the time, Appellant did not provide the names of the involved parties, but he later testified that he was contacted by his friend, Ashely Herrera, to drive her father, Gary Gardneo. Appellant told Sergeant Cockerham that he "fell into the deal," which was going to take place over the next twenty-four hours.

Sergeant Cockerham testified that he considered Appellant to be a productive CI and appreciated the transparency, but he did not have the jurisdiction or resources to follow Appellant to the Metroplex on such short notice. Instead, he told Appellant that if he wanted to go to the Metroplex, "he was on his own." He advised Appellant that if he was stopped or arrested, to discreetly tell the officers to contact him and he would "vouch" for Appellant. Sergeant Cockerham testified that Appellant was not authorized to distribute any of the methamphetamine—he was only authorized to go to the Metroplex, return with the methamphetamine, and immediately notify Sergeant Cockerham when he returned.

Appellant testified that he drove Gardneo to the Metroplex where Gardneo made the purchase and Appellant stayed in his vehicle. Appellant and Gardneo stopped in Comanche on the way back to Abilene, and Gardneo went inside of an apartment to a back room and went to sleep. While Gardneo was sleeping, Appellant called Herrera because he needed to return to Abilene. Herrera told Appellant that

3

he should go to Abilene and she would pick Gardneo up later and meet Appellant in Abilene.

Appellant returned to Abilene around 2:00 a.m. Around 7:30 a.m., Appellant learned that Herrera and Gardneo were in Abilene, and he called Sergeant Cockerham to inform him that the two pounds of methamphetamine was located at the Abilene Hotel and that the dealers would be leaving the hotel "within the hour in a black Dodge Ram pickup." When Appellant gave Sergeant Cockerham the tip, he was at the Royal Inn on the opposite side of town because he wanted to be away from the upcoming bust. Appellant testified that, while Appellant was at the Royal Inn waiting for Sergeant Cockerham and his team to complete their operations, he received multiple threats against his own life and his daughter's life because he was still unintentionally in possession of some of their property that was left in the back seat of his Mercedes. Appellant testified that he was afraid for his daughter's life and responded to some of the threats by claiming he was a federal agent.

Sergeant Cockerham and his team stopped the Dodge pickup for a traffic violation after it left the hotel. The occupants of the vehicle were in possession of a small amount of narcotics, but the officers did not recover the two pounds of methamphetamine. An FBI agent working with Sergeant Cockerham contacted Appellant by phone and directed him to bring the two pounds of methamphetamine to the Law Enforcement Center. Sergeant Cockerham testified that he also contacted Appellant, but Appellant "started making excuses and the phone, for some weird reason, went dead." Sergeant Cockerham made one more attempt to contact Appellant by phone and told him that if he surrendered the methamphetamine, they would try to make things right. Again, the phone went dead.

Appellant testified that he never had the two pounds of methamphetamine. He only received one ounce that he was paid "off the top" for driving the others to the Metroplex. He said that when he spoke to Sergeant Cockerham on Saturday

4

morning, he disclosed that he had received a cut of the methamphetamine as payment. According to Appellant, when Sergeant Cockerham became upset at Appellant about the missing methamphetamine, Appellant went to look for information at a known drug house to try to locate it.

Appellant did not bring the methamphetamine to the Law Enforcement Center and he did not attempt to contact Sergeant Cockerham again that day. Later that evening, Sergeant Cockerham informed Abilene Police Officer Brandon Scott, a K-9 officer, that Appellant drove a black Mercedes and that if the car was seen in a bad neighborhood or at a drug house, it probably had two pounds of methamphetamine in it.

That night, Cory Davis, an officer with the Abilene Police Department, noticed a black Mercedes outside of a known drug distribution house. He testified that he noticed the Mercedes immediately because it stuck out as unusual in the area. Officer Davis decided to watch the vehicle, and within fifteen minutes, the taillights of the Mercedes came on and the car pulled away from the distribution house. Officer Davis followed the Mercedes for several blocks until it failed to signal a turn, at which point Officer Davis initiated a traffic stop.

Officer Davis exited his patrol car, approached Appellant's vehicle, and began speaking to Appellant about the reason for the traffic stop. Appellant told Officer Davis that he was "working for Wayne." Officer Davis asked Appellant if he was currently working and if he had any drugs in the vehicle. Appellant responded that he was "always working" and that he did not have any drugs in the vehicle. Officer Davis continued to treat the stop as a standard traffic stop: he called for another unit to watch the vehicle while he ran standard checks and called for a K-9 unit because Appellant was seen leaving a known drug house. When asked to describe Appellant's demeanor, Officer Davis said that he appeared nervous, exhibited shaky hands, and continued to fidget and shuffle with his hands.

Officer Scott arrived with his K-9, Ringo. He informed Officer Davis about the tip he received from Sergeant Cockerham that Appellant was suspected to be in possession of drugs. Once Officer Davis completed the standard checks, he asked Appellant to step out of the vehicle while Officer Scott and Ringo performed a free-air sniff. While Officer Scott was circling the vehicle, Officer Davis asked Appellant a second time if there was anything in the vehicle. Appellant responded that there was "dope" in the back seat. Ringo alerted on the back seat, and the officers retrieved a binocular case containing a variety of unused needles, approximately 200 empty baggies, 3 grams of heroin, 4.4 grams of marihuana, and 30.22 grams of methamphetamine. Appellant told Officer Davis that the binocular case belonged to someone else. The officers also found a small digital scale in the back seat, which Officer Davis said, based on his experience, is used to weigh and sell narcotics. Officer Davis also testified that typical users have five or fewer grams and that thirty grams is not typical for personal use.

Officer Davis questioned Appellant about the contents of the binocular case, and Appellant said that he received them as payment, or "off the top," for drug-courier services. Officer Davis and Sergeant Cockerham both testified that it is common for people in the drug world to use drugs as currency to trade goods or pay for services. However, Sergeant Cockerham testified that Appellant never disclosed that he received a cut as payment or surrendered the methamphetamine as required to continue work as a CI. At one point during the stop, Appellant told Officer Davis that a portion of the methamphetamine was for "personal use." Officer Davis testified that CIs are not authorized to have drugs for personal use, so he did not believe that Appellant was working with Sergeant Cockerham.

After his arrest, Appellant wrote letters to Sergeant Cockerham from jail that attempted to make things right. Appellant testified that he wanted to work things out because he did not maliciously set Sergeant Cockerham up with bad information.

In the letters, Appellant said that he knew he made some mistakes. He testified that one of the mistakes was impersonating a federal agent when he was threatened. Sergeant Cockerham testified that he believed that Appellant's letters were an attempt to bargain with information to get released from jail.

*Analysis*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight witness testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish

guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

A person commits the first-degree felony offense of possession of a controlled substance with intent to deliver if he "knowingly . . . possesses with intent to deliver a controlled substance listed in Penalty Group 1 . . . four grams or more but less than 200 grams." HEALTH & SAFETY § 481.112(a), (d). Appellant relies on Section 481.062(a)(4) of the Health and Safety Code as a defense to the offense of possession. *Id.* § 481.062(a)(4). It provides as follows:

> (a) The following persons may possess a controlled substance under this chapter without registering with the Federal Drug Enforcement Administration:
>
> . . . .
>
> (4) an officer or employee of this state, another state, a political subdivision of this state or another state, or the United States who is lawfully engaged in the enforcement of a law relating to a controlled substance or drug or to a customs law and authorized to possess the controlled substance in the discharge of the person's official duties[.]

*Id.*; *see Wilson v. State*, 311 S.W.3d 452, 463 (Tex. Crim. App. 2010) (citing Section 481.062(a)(4) and noting in dicta that "[t]he Texas Legislature specifically exempted police officers who are acting in their official capacity from liability for the penal offense of possession of a controlled substance").

8

Appellant contends that the evidence at trial was insufficient to convict him because he was acting as a CI under the authority of law enforcement and was therefore entitled to the statutory exemption. *See* HEALTH & SAFETY § 481.062(a)(4). We note that Appellant's trial counsel relied on Section 481.062(a)(4) during closing arguments and that the trial court included a defensive instruction based on the statute in the court's charge. Because of our disposition, we express no opinion on whether a confidential informant may invoke Section 481.062(a)(4) as a defense to a charge of possession.

In support of his position, Appellant cites *Tarver v. State*, a case involving an off-duty narcotics officer who took out a portion of cocaine after it was seized and placed it in his briefcase. 650 S.W.2d 118, 119 (Tex. App.—Houston [14th Dist.] 1983, no pet.). *Tarver* involved the predecessor statute to Section 481.062(a)(4). *See id.* The defendant's supervising officer testified that there was "no legitimate reason" for the defendant to take a cut of the seized cocaine. *Id.* The Fourteenth Court of Appeals determined that the defendant deviated from the department's policy and, because of his deviation, was not entitled to the exemption protecting law enforcement officers lawfully engaged in the enforcement of law or in the discharge of their official duties. *Id.* at 120.

Appellant urges us to distinguish *Tarver* because the defendant's employment had a clear "scope" that was easily defined. Appellant contends that his direction from Sergeant Cockerham was "ill-defined," that the record contains legitimate reasons for his actions, and that the record supports his contention that he was an agent of law enforcement that had not concluded his service at the time of his arrest. Appellant also contends that the scope of his employment as a CI was much broader because he was "on his own" and not supervised for the drive to the Metroplex. We conclude that *Tarver* does not dictate a different result in this case.

Here, the State and the defense presented the jury with conflicting evidence. The State's evidence consisted of testimony that Appellant was on his own with his trip to the Metroplex because Sergeant Cockerham did not have sufficient advance notice to monitor the trip. Sergeant Cockerham testified that Appellant did not have "free range" to act independently. When asked if Appellant was authorized to sell any of the methamphetamine, Sergeant Cockerham testified that Appellant was not authorized to sell, consume, or possess any narcotics while he was working as a CI. Sergeant Cockerham also testified that Appellant never told him that he received a cut of the methamphetamine as payment for driving to the Metroplex. Officer Davis testified that when Appellant told him that part of the methamphetamine was for "personal use," he believed that Appellant was not working for Sergeant Cockerham because CIs are not authorized to have narcotics for personal use. Additionally, Appellant did not advise Officer Davis that he was in possession of methamphetamine when Officer Davis initially asked him if he possessed any controlled substances. Finally, Appellant wrote letters to Sergeant Cockerham from jail, acknowledging that he made a mistake. Taken together, Appellant's acts and omissions are inconsistent with a person lawfully engaged in law enforcement in the exercise of the person's official duties. *See* HEALTH & SAFETY § 481.062(a)(4).

In contrast, Appellant testified that he went to the Metroplex and received a cut of the methamphetamine as payment. He also testified that he was actively searching for the missing two pounds of methamphetamine because he wanted to make things right and continue to work as a CI. Finally, Appellant testified to his subjective belief that he was continuing to act as a confidential informant for Sergeant Cockerham at the time of his arrest.

As noted above, the evidence in this case is conflicting. It was the jury's duty as the trier of fact to judge the credibility and weight of the evidence. *Brooks*, 323 S.W.3d at 899. We presume that the jury resolved all conflicts in favor of the State.

*Jackson*, 443 U.S. at 236; *Clayton*, 235 S.W.3d at 778.  The jury's decision to reject Appellant's self-serving testimony was inherently a credibility determination to which we defer under the *Jackson* standard of review.

The record contains evidence that Appellant knowingly possessed the methamphetamine and paraphernalia—including a scale and numerous unused baggies—in the binocular case.  Likewise, there is evidence that Appellant was not authorized to possess the methamphetamine, or any of the other narcotics found, as a condition of his employment as a CI.  Taken together and viewed in the light most favorable to the verdict, we hold that there is sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Appellant was not operating as an agent of law enforcement and that he knowingly possessed the methamphetamine and had an intent to distribute it.  We overrule Appellant's sole issue on appeal.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


May 5, 2022

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.