# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00501-CR

**Chance Deallen Keller, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 69920, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Chance Deallen Keller was charged with capital murder. *See* Tex. Penal Code § 19.03(a)(2). In particular, the indictment alleged that Keller "intentionally cause[d] the death of . . . Steven Wright, by shooting [him] with a firearm, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery." At the end of the trial, the jury found Keller guilty, and Keller was sentenced to life in prison without the possibility of parole. *See id.* § 12.31(a)(2) (explaining that when State does not seek death penalty in capital-murder case and when defendant is found guilty, sentence is life imprisonment without possibility of parole). Keller appeals his conviction. We will affirm the district court's judgment of conviction.

## DISCUSSION

In his appeal, Keller presents five issues challenging his conviction. In his first two issues, Keller contends that the district court erred by overruling his objections to the admission of

evidence regarding extraneous aggravated-robbery offenses that he allegedly committed before the charged offense. In his third issue, he urges that the district court erred by refusing to submit a lesser-included-offense instruction for manslaughter. In his fourth issue, he argues that the State "failed to produce independent evidence to corroborate [his] extrajudicial statement that the murder occurred during the course of committing robbery." In his final issue, he alleges that he "was denied his right to compulsory process when the trial court failed to inquire into the legitimacy of [a witness]'s invocation of his Fifth Amendment privilege." We will address Keller's issues in the order briefed but will address his first two issues together.

**Extraneous Offenses**

As mentioned above, in his first two issues, Keller asserts that the district court erred by overruling his objections to the admission of evidence regarding extraneous robbery offenses. When objecting to the evidence, Keller argued that the evidence should not be admitted under Rules of Evidence 403 and 404.

The evidence at issue pertains to the alleged aggravated robberies of Aubry Waltrip and Margaret Biddy. *See* Tex. Penal Code § 29.03(a)(2) (stating that person commits aggravated robbery if he commits robbery while using or exhibiting deadly weapon). Regarding the alleged robbery of Waltrip, testimony was admitted during the trial showing that a week before the offense at issue in this case, Keller offered to sell some illegal drugs to Waltrip's boyfriend Jesus Perez that Perez planned to later resell. In his testimony, Perez explained that he had originally agreed to purchase "100 bars" from Keller for $250 but that Keller informed Perez that he could get Perez additional drugs in exchange for a "throw away gun." According to Perez, he agreed to the exchange,

2

and he gave Keller a chrome semiautomatic .22 caliber pistol with the understanding that Keller would later return with more drugs. In addition, Perez claimed that Keller told Perez to stay behind but insisted that Waltrip go with him to get the drugs. Moreover, Perez testified that he gave the purchase money to Waltrip before she left with Keller but that Waltrip later returned crying and without the money or any drugs.

In her testimony, Waltrip agreed that Keller had asked her to accompany him during the exchange and instructed Perez to stay behind. In addition, she explained that shortly after she left with Keller, Keller "put the gun to [her] head" and told her to give him the money that Perez had given her. Moreover, Waltrip testified that after she gave the money to Keller, he took off.

Regarding the second extraneous offense, testimony was introduced establishing that Keller robbed Biddy a few hours before the offense alleged in this case. When describing how she knew Keller, Biddy testified that she met Keller through a mutual acquaintance, Megan Richardson, and that Keller had visited her home on one or two occasions. Further, she explained that one day Keller showed up at her house and tried to sell her some cell phones and cameras and that when she said that she was not interested and had no money, he pulled a chrome gun out of his pocket and held the gun to her head. Next, she recalled that Keller asked her to hand over any money that she had and told her that if she did not, he was going to shoot her. Moreover, she related that Keller started to leave after she started screaming for her son and that she chased after him out of the house. In addition, she explained that when Keller left the house and when she went outside on the porch, she "heard a shot go off outside." Finally, she stated that when the police came to investigate, they found a shell casing.

In addition to Biddy's testimony, Officer Todd Rajkowski explained that he arrived at Biddy's home after responding to a call regarding the "discharge of a firearm." In his testimony, Officer Rajkowski stated that when the responding officers searched the area, one found a ".22 shell casing." During the trial, another officer, Detective Cassey Allen, provided additional testimony regarding the casing. Specifically, Detective Allen stated that she worked for the Department of Public Safety Crime Laboratory, that she compared the casing recovered from Biddy's property with another recovered from Wright's home, that those two casings were from cartridges fired from the same gun, and that both casings "were consistent with .22 long or long rifle cartridge cases."

Finally, evidence regarding this incident was admitted through a recording of a conversation between Keller and Chrisann Cameron that was made when Keller called Cameron while he was in jail. On the recording, Keller stated that he shot at Biddy when he left her home.

As mentioned above, during the trial, Keller objected to the admission of the evidence concerning these two prior extraneous offenses under Rule of Evidence 404. That rule generally prohibits the admission of "other crimes, wrongs or acts . . . to prove the character of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b). However, the rule does allow that type of evidence to be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*; *see Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (explaining that "evidence may be admissible when it has relevance apart from character conformity").

On appeal, we review a trial court's ruling regarding the admission of evidence under an abuse-of-discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

4

"A trial court abuses its discretion when its ruling is arbitrary or unreasonable." *Gaytan v. State*, 331 S.W.3d 218, 223 (Tex. App.—Austin 2011, pet. ref'd). But, a trial court does not abuse its discretion if its ruling lies within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). "A trial court's 404(b) ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Devoe*, 354 S.W.3d at 469. Provided that "the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed." *Id.*

The weapon that was used to kill Wright was never recovered, and no witnesses testified that they saw who shot Wright. Moreover, during the trial, Keller urged that other individuals could have been responsible for the death of Wright. *See McGregor v. State*, 394 S.W.3d 90, 118 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (discussing various ways in which identity can be raised, including by cross-examining witnesses). Accordingly, the identity of the shooter was at issue and was the primary area of dispute, and the evidence of the extraneous offenses was relevant to the identity and motive of the shooter in this case.[1] As discussed above, there was testimony

---

[1] Keller argues that identity "was not an issue in this case due to the multiple admissions he made to the murder of Wright." As will be detailed more thoroughly in Keller's other issues, various witnesses testified that Keller admitted that he shot Wright. In addition, two employees at the jail that Keller was housed in prior to trial, Mike Helfer and Austin Roberson, testified that Keller admitted to them that he had killed someone but did not name Wright in particular.

However, as discussed above, the weapon was not recovered and, therefore, could not directly link Keller to the murder. Moreover, Brittany Buckner and Keller's sister Lacy Fitch both testified that Keller told them that Cameron had stolen the gun from Keller. More importantly, Keller extensively argued that other people might have had a motive to kill Wright and argued that the police chose not to investigate them even though evidence allegedly linked them to the murder.

For example, in his opening statement, Keller asserted that "two suspects, Sarah Steglich and Brandon Hargett, [were] completely and totally uninvestigated" by the police. Similarly, in his

showing that Keller obtained a .22-caliber pistol approximately a week before the offense at issue here, that he used the weapon to rob Waltrip, that he shot a firearm generally matching the description of the gun obtained from Perez outside Biddy's property a few hours before Wright was killed, that he fired the weapon after unsuccessfully trying to rob Biddy and after explaining to Biddy that he needed money, and that the shell casings recovered from Biddy's property and from Wright's property were from cartridges that had been fired from the same gun.[2] *See Garcia v. State*, No. 05-05-01305-CR, 2006 Tex. App. LEXIS 5406, at *5 (Tex. App.—Dallas June 23, 2006, pet. ref'd) (not designated for publication) (concluding that casing from prior extraneous offense was relevant

---

closing argument, Keller urged that Steglich and Hargett may have been responsible for Wright's death but that the police chose not to investigate them. In addition, Keller questioned various witnesses about the possibility that Steglich and Hargett might have been involved and also urged that Wright might have been targeted by other individuals that he owed money to. Furthermore, Keller implied during his questioning that Steglich was ignored as a possible suspect because her father was a law-enforcement officer. Finally, when questioning Steglich, Keller also inquired into whether she had previously told the police her suspicion that Wright's stepfather, Gunter Pontes, might have been responsible.

[2] In his brief, Keller contends that the evidence of the extraneous offenses is irrelevant to the crime at issue in this appeal because the State never proved that the "pistol taken from Perez was the same pistol used to rob Biddy or murder Wright" and because the State "did not prove that the projectile which killed Wright was at some point part of the casing found in Wright's bedroom." Although we recognize that Keller correctly notes that matching the bullet found in Wright's body to the incident at Biddy's property and to the robbery of Waltrip would have presented a stronger case, we cannot agree that evidence of the extraneous offenses and of the testing performed on the casing recovered from Wright's property is irrelevant to the crime at issue. *See* Tex. R. Evid. 401 (defining evidence as relevant if it has "any tendency to make the existence of the fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); *cf. Quesada v. State*, No. 04-04-00438-CR, 2006 Tex. App. LEXIS 6181, at *4, *7-8 (Tex. App.—San Antonio July 19, 2006, pet. dism'd) (mem. op., not designated for publication) (concluding that there was "[a] reasonable connection" between shell casings "spent . . . months before the crime was committed" that were recovered from defendant's bedroom and those used during commission of crime alleged).

because it matched those recovered from scene of charged offense and helped to establish identity of shooter).

In addition to helping to link Keller to the capital murder of Wright through the description of the weapon used during the prior offenses and through testing performed on the casings recovered from the scenes, the evidence of the extraneous offenses helped link Keller to the charged offense due to the similarity of the prior offenses and by providing a motive for the charged offense. For example, Officer Robert Preston testified that after he advised Keller of his *Miranda* rights, Keller told him that "he was into jacking or robbing" drug dealers. *See Casey v. State*, 215 S.W.3d 870, 881 (Tex. Crim. App. 2007) (explaining that modus operandi refers to distinctive manner of committing crimes and may be used, among other reasons, as proof of identity or motive). Additionally, two of Keller's witnesses provided similar testimony regarding the types of victims that Keller targeted. In particular, Sarah Steglich explained that she first met Keller when he tried to steal illegal drugs from her, and Taylor Camp testified that she was a friend of Keller's and that he had a reputation for stealing from known drug dealers.

That testimony is consistent with the testimony from Waltrip and Perez describing Keller's actions. Moreover, although Biddy testified that Keller attempted to rob her because she refused to purchase cell phones and cameras from him, Officer Rajkowski explained in his testimony that he believed that Keller attempted to rob Biddy because he thought that she had illegal drugs in her home. As support for this testimony, Officer Rajkowski revealed that he suspected that Biddy was under the influence of some substance when he interviewed her after the incident. In addition, Biddy admitted during her testimony that she had previously been charged with possession with

7

intent to deliver illegal drugs and pleaded guilty to the lesser offense of possession. Finally, in the taped conversation between Keller and Cameron, Keller describes Biddy as a known drug dealer.

Regarding the charged offense, various witnesses, including Waltrip and Wright's stepfather, Gunter Pontes, testified that Wright used and sold drugs. In addition, evidence was introduced establishing that the charged offense occurred just a few hours after Keller unsuccessfully attempted to rob Biddy.

Based on the preceding, we cannot conclude that the district court abused its discretion by determining that the evidence of the extraneous offenses was admissible for purposes other than character conformity.

In his second issue, Keller contends that the evidence of the two extraneous offenses should not have been admitted under Rule 403 because the probative value of the evidence is outweighed by its prejudicial value. *See* Tex. R. Evid. 403. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Id.* (emphasis added). "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted).

8

When performing a 403 analysis, courts should balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnote omitted); *see Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (explaining that "probative value" refers to how strongly evidence makes existence of fact more or less probable and to how much proponent needs evidence and that "unfair prejudice" considers how likely evidence might result in decision made on improper basis, including emotional one). As with other evidentiary rulings, appellate courts review a trial court's ruling on a 403 objection for an abuse of discretion. *See Pawlak*, 420 S.W.3d at 810. Moreover, reviewing courts should bear in mind that trial courts are given "an especially high level of deference" for Rule 403 determinations. *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007).

As discussed in the first issue, the evidence of the extraneous offenses was relevant to the issue of whether and why Keller shot Wright.

Regarding the State's need for the evidence, we note that there was other testimony linking Keller to Wright. For example, as will be discussed more thoroughly later, Richardson, who was romantically involved with Keller at the time of the offense, testified that she drove Keller to someone's home on the night of the shooting, and her phone records placed her phone near Wright's

9

home around the time of the murder. But the evidence from Richardson did not establish that Keller had a gun when he went to Wright's home, and no witnesses testified that they observed the shooting. In addition, although a couple of witnesses testified that Keller told them that he had shot Wright, Keller did not confess to the crime in his conversations with the police, and he strongly disputed that he was the killer during the trial and urged that other individuals were responsible. Moreover, the gun that was used in the shooting was never recovered and, therefore, could not have been used to help identify the shooter through forensic evidence. Accordingly, we believe, as Keller mentions in his brief, that the State's need for this type of evidence linking Keller to the shooting of Wright was great.

Unquestionably, evidence establishing that a defendant committed two violent offenses shortly before the offense at issue could potentially have an impact on the jury.[3] However, the jury charge in this case curtailed that potential for misuse of the evidence regarding the

---

[3] In this issue, Keller contends that this case presents a unique situation in which the prior offenses could have confused the jury. When making this argument, Keller asserts that the indictment failed to specifically allege that the victim of the robbery was Wright. In addition, Keller notes that the charge instructed the jury that conduct occurring in flight after a robbery is part of the conduct constituting "[i]n the course of committing theft." Accordingly, Keller urges that the jury might have relied on the evidence of the prior robberies, particularly the robbery of Biddy a few hours earlier, to conclude that the elements of the alleged capital murder were satisfied.

As an initial matter, we are not persuaded that Keller's reading of the indictment is a fair one. The indictment alleges that Keller "intentionally cause[d] the death of . . . Wright, by shooting . . . Wright with a firearm" while "then and there in the course of committing or attempting to commit the offense of robbery." Accordingly, the only victim listed was Wright, and the indictment alleged that Wright was killed during the robbery. Moreover, all of the evidence regarding the prior offenses demonstrated that the prior offenses occurred before Wright was killed and before the robbery of Wright was attempted. In any event, the charge given to the jury specified that Wright was the victim of the robbery.

10

extraneous offenses. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (explaining that appellate courts "presume the jury follows the trial court's instructions in the manner presented"). In particular, the charge provided specific instructions regarding extraneous offenses and informed the jury that it could not "consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense . . . and even then you may only consider the same in determining the identity, intent, knowledge, preparation, motive, or plan of the defendant, in connection with the offense, if any, alleged against him in the indictment." Moreover, the charge set out the elements for robbery and murder and defined various relevant terms, including "in the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." In addition, the charge instructed the jury to find Keller guilty of capital murder, "bearing in mind the foregoing instructions and definitions, if you believe from the evidence beyond a reasonable doubt that . . . Keller . . . did then and there intentionally cause the death of . . . Wright, by shooting . . . Wright with a firearm, and [Keller] was then and there in the course of committing or attempting to commit the offense of robbery of . . . Wright." Finally, the evidence regarding the prior offenses was not overly technical or confusing and did not concern topics that the jury was not equipped to consider.

In his brief, Keller correctly points out that a large portion of the State's case was dedicated to establishing the occurrence of these extraneous offenses and that the State emphasized these offenses during its opening and closing statements.[4] However, as mentioned previously, the

---

[4] In his brief, Keller estimates that "34% of the total testimony presented by the State concerned the extraneous aggravated robberies of Biddy and Wal[t]rip." *Compare McGregor v. State*, 394 S.W.3d 90, 121-22 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding that fact

identity of the shooter was the crucial factor to be proved in this case, and because there were no witnesses to the shooting, the identity needed to be proved through circumstantial evidence, including through the evidence of prior extraneous offenses. Moreover, the jury charge correctly instructed the jury that before they could consider the extraneous offenses, the State had the burden of establishing those offenses beyond a reasonable doubt. Similarly, when discussing the importance of these extraneous offenses, the State emphasized that the evidence could only be considered for the limited purposes identified in the jury charge. Further, although the State called witnesses to describe the offenses and identify Keller as the perpetrator as well as describe evidence that was collected from the extraneous offenses and tests that were performed on that evidence in order to properly link the extraneous offense to the charged offense, the amount of time spent discussing the tests used to link those prior offenses to the current offense was minimal.

After considering the factors above and in light of the standard of review and the presumptions regarding admissibility, we cannot conclude that the district court abused its discretion by overruling Keller's Rule 403 objection. *See Garcia*, 2006 Tex. App. LEXIS 5406, at *7-8 (concluding that evidence of prior shooting was not improperly admitted over Rule 403 objection when gun used in charged offense was not recovered, when evidence linking defendant to gun and murders was needed, when time spent developing prior offense was substantial but amount of time

___

that evidence of extraneous offenses constituted one third of trial weighed against admissibility but upholding trial court's decision to admit evidence), *and Newton v. State*, 301 S.W.3d 315, 321-22 (Tex. App.—Waco 2009, pet. ref'd) (same for evidence comprising 27% of testimony), *with Russell v. State*, 113 S.W.3d 530, 544-49 (Tex. App.—Fort Worth 2003, pet. ref'd) (determining that trial court erred by admitting evidence of extraneous offenses where evidence was 30% of testimony, where State's need for evidence was low, and where evidence of extraneous offense was "more heinous" than charged offense).

12

actually linking crimes was minimal, when details of prior offense were kept to minimum, and when State's need for evidence was great due to fact that identity was disputed issue).

For the reasons previously given, we overrule Keller's first and second issues on appeal.

**Lesser-Included Charge**

In his third issue on appeal, Keller contends that the district court erred by denying his request for a lesser-included-offense instruction in the jury charge for manslaughter.

Determining whether a lesser-included-offense instruction should be given involves two steps. *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013); *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). The first step is a question of law and considers "whether an offense is a lesser-included offense of the alleged offense." *Hall*, 225 S.W.3d at 535. This step "does not depend on the evidence to be produced at the trial" and "compares the elements of the offense as alleged in the indictment with the elements of the requested lesser offense." *Meru*, 414 S.W.3d at 162. An offense is a lesser-included one if "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged" or if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." Tex. Code Crim. Proc. art. 37.09(1), (3).

As discussed earlier, the indictment in this case alleged that Keller "did then and there intentionally cause the death of . . . Wright, by shooting . . . Wright with a firearm, and [Keller] was then and there in the course of committing or attempting to commit the offense of robbery." *See* Tex. Penal Code §§ 19.02(b) (setting out elements for murder), .03 (providing that murder is capital

13

murder if defendant commits murder "in the course of committing or attempting to commit . . . robbery"). A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). On the other hand, a person commits manslaughter "if he recklessly causes the death of an individual." *Id.* § 19.04. A person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c).

Both the indicted offense and the offense of manslaughter involve the death of an individual, but the two offenses differ in "the mental state required." *Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Moreover, the crime of manslaughter is established by proof of the same or less than all of the facts required to establish the commission of the offense for which Keller was indicted. Accordingly, manslaughter is a lesser-included offense of the crime at issue in this case. *See* Tex. Code Crim. Proc. art. 37.09; *see also Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002) (recognizing that "manslaughter is a lesser-included offense of capital murder").

Under the second step, courts must consider "whether there is evidence that supports giving the instruction to the jury." *Hall*, 225 S.W.3d at 536. "This is a fact determination and is based on the evidence presented at trial." *Meru*, 414 S.W.3d at 163. A defendant is entitled to the instruction if "a rational jury could find that, if the defendant is guilty, he is guilty only of the lesser offense." *Id.* "If there is evidence that raises a fact issue of whether the defendant is guilty only of the lesser offense, an instruction on the lesser-included offense is warranted, regardless of whether the evidence is weak, impeached, or contradicted." *Id.*; *see Hampton v. State*, 109 S.W.3d 437, 441

14

(Tex. Crim. App. 2003) (explaining that "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted"). In this case, the second step "is satisfied if there is some evidence from which a rational jury could find that [Keller] consciously disregarded the substantial and unjustifiable risk that his conduct would cause [Wright]'s death" rather than find that it was Keller's "conscious objective or desire to cause [Wright]'s death." *See Arnold*, 234 S.W.3d at 671.

As support for his assertion that a lesser-included-offense instruction should have been given, Keller points to testimony from his sister Alexis Keller and from his friend Brittany Buckner. In her testimony, Alexis explained that when she visited Keller in jail after he was arrested, she asked him if he shot Wright and that he told her that "it was a mistake and that he knows he shouldn't have done that." When Buckner testified, she stated that she previously gave a statement to the police in which she related that prior to Keller's arrest she was traveling in a car with Keller and that when the police were pulling them over, Keller stated that "he went and—to rob [Wright], and he—they got in a fight and he struggled. And then he pulled his gun out and that he shot, and he didn't know whether or not he killed him. He said that [Wright] was begging for him not to leave and—but [Keller] ran away." According to Keller, this testimony shows that he recklessly caused the death of Wright during a struggle and that he did not intend to kill Wright.

However, we do not believe that this testimony would have allowed a jury to determine that if Keller was guilty, he was only guilty of manslaughter. Although Alexis's testimony indicated that Keller expressed remorse for his actions, a feeling of remorse after the offense is

15

not evidence that Keller was acting recklessly when the offense occurred. If anything, Alexis's testimony relating Keller's statement that "he shouldn't have done that" evidences Keller's intent to shoot Wright at the time of the incident. Similarly, we do not believe that Buckner's testimony constituted evidence that Keller was acting recklessly. Although Buckner mentioned that Keller and Wright physically struggled before Wright was shot, Buckner did not testify that Keller told her that Wright was accidentally or inadvertently shot during the struggle.[5] Instead, Buckner recalled that Keller told her that he intended to rob Wright and that he shot Wright after the struggle. Moreover, Keller's assertion that the evidence shows that he did not act intentionally is undercut by the portion

---

[5] On appeal, Keller refers to several cases in which courts determined that a charge on manslaughter should have been given due to evidence showing that a gun accidentally discharged, due to evidence showing that victim was shot during a struggle, or due to evidence showing that a defendant engaged in reckless behavior. *See, e.g.*, *Ross v. State*, 861 S.W.2d 870, 875 (Tex. Crim. App. 1993) (concluding that charge was appropriate where evidence showed that gun was pointed at victim's head and "went off" when defendant "shoved" the victim), *rev'd in part on rehearing*, 861 S.W.2d 870, 877 (Tex. Crim. App. 2013) (holding that "there was not sufficient evidence to raise the issue of involuntary manslaughter"); *Hayes v. State*, 728 S.W.2d 804, 809-10 (Tex. Crim. App. 1987) (determining that charge on recklessness should have been given where evidence showed that victim was shot during struggle with defendant and where defendant "testified that he did not intend to shoot the complainant and that the actual discharge of the gun was accidental"); *Bell v. State*, 693 S.W.2d 434, 441-42, 444 (Tex. Crim. App. 1985) (finding that defendant was entitled to instruction when defendant testified that he did not aim for victim's home when he fired and was instead shooting into air); *Salinas v. State*, 644 S.W.2d 744, 746 (Tex. Crim. App. 1983) (concluding that manslaughter charge was needed where defendant testified that gun that he was holding accidentally went off and that he did not intend to shoot anyone); *Mullins v. State*, 767 S.W.2d 166, 169-70 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (determining that instruction for reckless conduct should have been given where evidence would have allowed jury to infer that "defendant recklessly fired a warning shot intended to hit a vacant apartment"); *Hernandez v. State*, 742 S.W.2d 841, 843 (Tex. App.—Corpus Christi 1987, no pet.) (concluding that manslaughter charge was appropriate where defendant testified that although he shot weapon, he did not intend to hit victim and that he only intended to scare victim). However, we believe that the cases that Keller refers to are distinguishable from the present circumstances, particularly in light of the nature of the testimony that Keller relies on in presenting this issue.

of Buckner's testimony in which she explained that Keller left Wright to die after he was shot even though he was begging for help.

For these reasons, we cannot conclude that the second prong of the test was satisfied in this case, nor can we conclude that the district court erred by failing to include in the jury charge an instruction regarding manslaughter. Accordingly, we overrule Keller's third issue on appeal.

**Proof of Corpus Delicti of Robbery**

In his fourth issue on appeal, Keller concedes that the evidence is sufficient to establish that Wright was murdered. However, he notes that he was convicted of capital murder and that the jury determined that he killed Wright "in the course of committing or attempting to commit the offense of robbery." Although he acknowledges that Buckner testified that he told her that he went to Wright's home in order "to rob" Wright, he urges that the doctrine of corpus delicti requires the State to provide "independent evidence to corroborate [his] extrajudicial statement that the murder occurred during the course of committing robbery." Moreover, he urges that this requirement was not met in this case because there was no evidence demonstrating that anything had been taken from Wright's home.[6] Accordingly, Keller argues that there was no evidence showing a completed robbery and that, therefore, "[t]he judgment should be reformed to the offense of murder and the cause remanded for a punishment hearing for the offense of murder."

Under common law, the doctrine pertained to the usability of a confession made by a criminal defendant outside of court, *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App.

---

[6] As support for this proposition, Keller points to the testimony of various witnesses, including investigating officers, describing how after Wright was murdered, drugs and money were found in the home.

2013), and referred to the first two components of the following three-part conceptual breakdown of a criminal offense:

> first, the occurrence of the special kind of injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing); secondly, somebody's criminality as the source of the loss,—these two together involving the commission of a crime by somebody; and, thirdly, the accused's identity as the doer of this crime.

*Id.* at 741 (quoting 3 John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* § 2072 at 2782 (1904)). The third element was not "considered part of the *corpus delicti* because [the defendant], of course, had already confessed to the crime." *Id.*

"The corpus delicti doctrine requires that evidence independent of a defendant's extrajudicial confession show that the 'essential nature' of the charged crime was committed by someone," *Hacker v. State*, 389 S.W.3d 860, 866 (Tex. Crim. App. 2013) (quoting *Bible v. State*, 162 S.W.3d 234, 246 (Tex. Crim. App. 2005)), and was designed to guard "against the shocking spectacle and deleterious effect upon the criminal justice system when a murder victim suddenly reappeared, hale and hearty, after his self-confessed murderer had been tried and executed," *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002). The requirements of the doctrine are met "if some evidence outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred." *Id.* at 645.

Recently, the court of criminal appeals explained that "[t]he old *corpus-delicti* 'usability' rule has . . . been superseded by the due-process 'sufficiency of the evidence' model set out in *Jackson v. Virginia*." *Carrizales*, 414 S.W.3d at 742; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (requiring appellate courts to review evidence in light most favorable to verdict and

18

determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" bearing mind that it is factfinder's duty to weigh evidence, to resolve conflicts in testimony, and to make reasonable inferences "from basic facts to ultimate facts"). In other words, the court stated that "proof of the *corpus delicti* in non-confession cases is wholly subsumed by the *Jackson* elements test." *Carrizales*, 414 S.W.3d at 744 (explaining that if State proves each element beyond reasonable doubt, there is no doubt that crime was committed by defendant). Accordingly, the court clarified that the doctrine "exists, in the post *Jackson v. Virginia* era, only in confession cases." *Id.* at 739 (footnote omitted).

As mentioned above, Keller was charged with capital murder for killing Wright "in the course of committing or attempting to commit the offense of robbery." As conceded by Keller, Wright's body was recovered, and the forensic evidence established that Wright had been murdered. Accordingly, to the extent that the doctrine of corpus delicti applies in this case, it was not necessary for the State to present "independent corroboration of each element and descriptive allegation" of the underlying felony in order to satisfy the requirements of the doctrine in this case; instead, the doctrine only "requires that there be some independent evidence tending to show the essential nature of the charged crime." *Salazar*, 86 S.W.3d at 644. In this issue, Keller focuses on evidence that he contends shows that there was no completed robbery and essentially ignores the "attempted" portion of the charge. For that reason alone, Keller's conviction could arguably be upheld. In any event, we believe that the evidence presented tended to establish the "essential nature" of attempted robbery.

Under the Penal Code, an individual commits robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code § 29.02(a). Moreover, "'[i]n the

19

course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1); *see also Bustamante v. State*, 106 S.W.3d 738, 740-41 (Tex. Crim. App. 2003) (explaining that "an intent to steal may be inferred from circumstantial evidence"); *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd) (noting that "[p]roof of a completed theft is not even required" for robbery conviction). An individual attempts to commit an offense if "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." Tex. Penal Code § 15.01(a).

During the trial, in addition to evidence establishing that Wright was shot and died from those wounds, the following evidence relevant to the charge of robbery or attempted robbery was introduced:

- that Keller targeted drug dealers for robbery,

- that Perez and Wright were known drug dealers,

- that Keller believed that Biddy was a drug dealer,

- that Keller obtained a weapon from Perez shortly before he robbed Waltrip,

- that Keller robbed Waltrip using that weapon after Perez handed her money and later robbed Biddy just a few hours before the offense at issue,

- that the weapon used by Keller to rob Biddy generally matched the weapon that he got from Perez,
- that Keller fired the weapon when Biddy did not give him any money,

- that the casing from a cartridge recovered from Biddy's property matched the casing from a cartridge recovered from Wright's home,
- that Keller asked Richardson to drive him to someone's home on the night of the murder,

20

- that Keller asked if he could use Richardson's phone to call someone several times while they were driving,

- that Richardson's phone had been used to call Wright four times on the night that he was killed,

- that Richardson waited in the car for Keller to return after he went inside the home, and

- that records from cell phone towers near Wright's home placed Richardson's phone in close proximity to Wright's home at the time of the murder.

In light of this evidence, we believe that some evidence independent of the statement Keller made to Buckner was introduced tending to establish the essential nature of the crime of attempted robbery. *See Hacker*, 389 S.W.3d at 866; *Salazar*, 86 S.W.3d at 644-45.

For these reasons, we overrule Keller's fourth issue on appeal.

**Witness's Privilege Against Self-incrimination**

In his final issue on appeal, Keller contends that the district court erred by allowing one of the witnesses at trial, Brandon Hargett, to invoke his right against self-incrimination without inquiring into the legitimacy of that invocation. At the time that he was called to testify, Hargett had pending against him a motion seeking to revoke his probation for two burglary convictions. When seeking to question Hargett, Keller stated that Hargett "has a great deal of salient facts to our defense and that we need to present." Because the trial court allegedly allowed Hargett to invoke the privilege without performing an inquiry, Keller contends that his Sixth Amendment right to compulsory process was denied. *See Boler v. State*, 177 S.W.3d 366, 371 (Tex. App.—Houston [1st Dist.] 2005,

21

pet. ref'd) (stating that privilege against self-incrimination overrides defendant's right to compulsory process of witnesses).

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege extends "'to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.'" *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486-87. The protections of the privilege only extend to witnesses with "reasonable cause to apprehend danger from a direct answer." *Id.* at 486. In appraising the propriety of the invocation, the trial court should be governed by the facts in evidence and the peculiarities of the case, and "a trial court is required to make an inquiry into the reasonableness of a witness's assertion of the Fifth Amendment privilege against self-incrimination." *Walters v. State*, 359 S.W.3d 212, 215, 216 (Tex. Crim. App. 2011); *see also id.* at 215 (providing that "trial courts are required to inquire into the source and reasonableness of" witness's fear of prosecution). But a trial court "cannot compel a witness to answer unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken in asserting the privilege, and that the answer cannot possibly tend to incriminate the witness." *Grayson v. State*, 684 S.W.2d 691, 696 (Tex. Crim. App. 1984). On appeal, we review a trial court's decision allowing a witness to invoke his Fifth Amendment privilege for an abuse of discretion. *United States v.*

22

*Washington*, 318 F.3d 845, 856 (8th Cir. 2003); *Castillo-Salgado v. State*, No. 07-12-00393-CR, 2014 Tex. App. LEXIS 8312, at *4 (Tex. App.—Amarillo July 30, 2014, no pet.) (mem. op., not designated for publication).

In a hearing held outside the presence of the jury, Hargett explained that he intended to invoke his Fifth Amendment right because of the motion to revoke. Further, Hargett clarified that he was concerned that his answers could be used against him during a revocation hearing, and Keller's counsel responded, "You are about a hundred percent right on that, sir." When discussing the matter, Keller's attorney stated that he wanted to question Hargett but also informed the district court as follows:

> Being a defense attorney, I am concerned with the gentleman's level of understanding of his predicament. But I am also concerned that if I proceed at this point and the jury comes in and I follow the questions that I am going to follow, any one of about three yes answers or even more will simply hasten and increase his right of possibly getting his probation revoked. . . . I don't want to create something that I can't undo.

The State responded by saying that it was "going to ask him a whole lot of stuff. We're going to do a full cross-examination about that motion to revoke and violation and everything else." Shortly thereafter, the district court verified that Hargett had been appointed an attorney regarding the motion to revoke and temporarily excused Hargett so that he could confer with his attorney regarding the potential consequences of testifying.

On the following day, the district court reconvened and further addressed the issue, and Hargett's attorney was present during the hearing. In that hearing, Keller's attorney stated that he was not going to ask Hargett "to step on his own rights" but stated that he wanted to ask Hargett

23

questions that he did not believe would "be incriminating to him, but merely generic information." Further, Keller's attorney proposed questioning Hargett to see which questions, "if any, he may try to exercise the Fifth for," but then warned, "I cannot speak for the State. So what I may accomplish in direct the State may want to expand on cross." When discussing the predicament, the State explained as follows:

> That's the concern, Your Honor. We are entitled to a full cross-examination and not a limited cross-examination and that cross-examination without fail would subject this defendant to criminal liability regarding things done on probation. . . . And you can't limit what we get to ask him about and then he can't come back, well, I'm going to take the Fifth on some and talk about others. It's all or nothing."

Keller's attorney agreed and stated, "I can't dispute what the State is saying."

Then, Keller's attorney asked Hargett whether and how long he knew Wright, whether he knew that Wright sold drugs, whether he visited Wright's home regularly, whether and how well he knew Steglich, whether he had a tattoo of Steghlich's name, when he got the tattoo, whether he had access to Steghlich's phone around the time of the offense at issue, and whether he sent a text using her phone around the time of the offense discussing heroin that he or Steghlich "had acquired." But Hargett invoked the Fifth Amendment and did not answer any of the questions.

After Hargett invoked his Fifth Amendment right, Keller's attorney stated that the questions listed above "would be the questions that we would be asking" in front of the jury and that "those questions . . . would be critical to the defense case, it would establish his knowledge, his location and his wherewithal on the day before the event and on the night of the event and for a

24

couple of days after." In addition, Keller's attorney repeated that he believed that he would be entitled to ask Hargett if he was the author of the text concerning heroin.[7]

Finally, Keller's attorney stated that he did not believe that those questions would be incriminating but stated that he did "not have the right to give [Hargett] advice so [he] would defer to [Hargett's] attorney." After Hargett again invoked his Fifth Amendment right, the State requested that this exchange not occur in front of the jury, and Keller's attorney stated, "I've seen all of the gentlemen I need to see."

In light of the above, we cannot agree with Keller's assertion that the district court failed to conduct an inquiry into the legitimacy of Hargett's invocation. As mentioned above, the district court convened a hearing regarding the matter outside the presence of the jury. Further, although Hargett was asked few questions regarding his concerns about testifying, he did communicate that he was afraid his answers would be used against him in a revocation proceeding. Moreover, both the State and Keller agreed that Hargett's concerns were well-founded. In fact, Keller specifically stated that Hargett's answers would "hasten and increase" the probability of a revocation. It was this concern that prompted the district court to allow Hargett an opportunity to consult with an attorney before testifying, and Keller agreed to defer to whatever recommendation Hargett's attorney made. In addition, although Hargett did not answer them, the questions that Keller asked Hargett concerned,

---

[7] Although Keller's attorney inquired whether Hargett had sent a text message, he later explained that the message at issue was a voicemail message and not a text message. The subject of the voicemail had been mentioned during Waltrip's testimony when Keller attempted to question Waltrip regarding a message that she received from Hargett in which he allegedly stated that Adrian Morin was involved in the death of Wright. When Keller asked Waltrip about the message, the State successfully objected on hearsay grounds. Later, in a hearing outside the presence of the jury, Keller and the State agreed that the message had been deleted. The district court's ruling regarding the admissibility of the voicemail is not an issue in this appeal.

among other topics, whether Hargett regularly socialized with an individual that sold illegal drugs and whether he had obtained possession of drugs after the offense in question.[8] Moreover, throughout the trial, Keller had argued that Hargett should have been investigated as a suspect in the charged offense, and some of the questions posed by Keller's attorney were designed to link Hargett to the offense. *See Ohio v. Reiner*, 532 U.S. 17, 21-22 (2001) (explaining that it was reasonable for witness to fear that answers might incriminate her when defense's theory was that witness was responsible for victim's death). Finally, after Hargett refused to answer any of Keller's questions, Keller did not ask the district court to make any further inquiries regarding the propriety of that invocation.

After carefully reviewing the record in this matter, we cannot conclude that the district court abused its discretion by failing to inquire into the legitimacy of Hargett's invocation, nor can we conclude that the district court abused its discretion by failing to conclude that Hargett was mistaken when asserting the privilege because the answers could not possibly tend to incriminate him. Accordingly, we overrule Keller's final issue on appeal.

### CONCLUSION

Having overruled all of Keller's issues on appeal, we affirm the district court's judgment of conviction.

---

[8] In his brief, Keller points to a statement made by the district court in which the district court described the motion to revoke as alleging technical violations. Based on this statement, Keller urges that if a proper objection had been made, the State would not have been allowed to inquire into the technical violations on cross-examination. *See* Tex. R. Evid. 608(b) (prohibiting cross-examination regarding specific instances of conduct by witness for "the purpose of attacking or supporting the witness's credibility"). Accordingly, Keller contends that "Hargett's apprehension of danger was not well founded." However, as summarized above, the answers to the questions posed by Keller could have been used against Hargett in a future proceeding.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   November 20, 2014

Do Not Publish