# Court of Appeals
## Tenth Appellate District of Texas

---

### 10-24-00231-CR

---

Roger Dale May,
Appellant

v.

The State of Texas,
Appellee

---

On appeal from the
13th District Court of Navarro County, Texas
Judge H. D. Black Jr., presiding
Trial Court Cause No. D42,611-CR

---

JUSTICE SMITH delivered the opinion of the Court.

## MEMORANDUM OPINION

Roger Dale May appeals his convictions for trafficking of persons and sexual performance by a child. After the jury found him guilty, the trial court assessed punishment at fifteen years of confinement in the Texas Department of Corrections—Institutional Division on each count, to run concurrently. In three issues, May contends the evidence is insufficient to support his

convictions and the trial court erred in admitting extraneous offense evidence. We affirm.

## BACKGROUND

During a Johnson County Sheriff's office investigation in an unrelated case, investigators seized a phone owned by William Junkert. Examination of the data on the phone revealed a photo of Junkert engaging in sexual contact with a young boy. Investigators determined that the photo had been sent to Junkert's phone from a phone owned by May. They arrested May and seized his phone. After the child was identified as C.R., a resident of Navarro County, the case was transferred.

C.R. is a non-verbal autistic boy, who was nine years old at the time the photo was taken. He lived with his mother, Michelle Cannon and grandmother, Mary Rainey in a house owned by Rainey. The photo was taken in one of the bedrooms of their house. Rainey is May's aunt. Junkert is May's boyfriend.

Sergeant Rex Kiser, a forensics computer examiner with the Fort Worth Police Department, downloaded the data on May's phone. He found several photos but could not say if the photos were taken with May's phone. The photo of Junkert and C.R., introduced as State's Exhibit 5, was a screenshot, a picture of a picture, that was taken on April 30, 2019 at 1:33 a.m. and 38

seconds. It was sent to Junkert's phone by text message on the same date at 1:34 a.m. Kiser explained that taking a screen shot of a picture and texting it is a way to avoid detection because the metadata is stripped in the process. The photo was manually backed up to a microSD card on September 23, 2019 by way of the Smart Switch Back Up app. The Smart Switch app allows one to back up data from one Samsung phone to another Samsung phone.

Cannon, Rainey, and Junkert each testified, providing their perspective about who took the photo and how that person obtained access to C.R. The jury determined May was guilty of both offenses. After sentencing, May appealed the judgments.

## SUFFICIENCY OF THE EVIDENCE

In his first and second issues, May contends the evidence is insufficient to support a finding of guilty of trafficking of persons or sexual performance by a child. Asserting there is no physical evidence tying him to the charges, he contends the witnesses' testimony was conflicting and their credibility was questionable. He also contends that Junkert, and possibly a second individual, Johnny Frost, a friend of Cannon's, had access to his phone. Further, he argues the weak and compromised nature of the State's evidence should be considered.

**Standard of Review**

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony, we defer to those determinations. *Brooks*, 323 S.W.3d at 899. We give deference to the trier of fact's responsibility to fairly resolve conflicts in testimony and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that determination. *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the

conviction. *Hooper*, 214 S.W.3d at 13. Evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013).

**Applicable Law**

A person commits the offense of trafficking of persons if he knowingly traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by Texas Penal Code Section 21.11, indecency with a child. TEX. PENAL CODE ANN. § 20A.02(a)(7)(B). A person commits indecency with a child if, with a child younger than seventeen, he engages in sexual contact with the child or causes the child to engage in sexual contact. *Id.* § 21.11(a)(1). "Sexual contact" means any touching of the anus, breast, or any part of the genitals of a child, if committed with the intent to arouse or gratify the sexual desire of any person. *Id.* § 21.11(c)(1). In Chapter 20A, to "traffic" means to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means. *Id.* § 20A.01(4).

A person commits the offense of sexual performance by a child if, knowing the character and content thereof, he employs, authorizes or induces a child younger than eighteen years of age to engage in sexual conduct or a sexual performance. *Id.* § 43.25(b). Performance means any play, motion

picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons. *Id.* § 43.25(a)(3).

**Analysis**

May contends the evidence is insufficient to prove either offense. Recognizing that the only physical evidence was a photo of the child with Junkert that was on his phone, May contends someone else used his phone to take the screen shot and text it to Junkert. May argues that the jury's verdict turns on the credibility of Cannon, Rainey, and Junkert. He argues that the witnesses' testimony conflicted regarding May's, Junkert's, and Frost's access to Rainey's home and to the child. He contends Cannon's and Rainey's credibility should be questioned because of the drug use in the home. He implies that Cannon is not believable because she has been investigated by Child Protective Services multiple times and that Rainey's testimony is undermined by the fact that she was convicted of possession of marijuana two years after the offenses in this case were committed.

*The Family's Explanation*

Michelle Cannon testified that the only time Junkert was at her house was when he came with May. They came over once every couple of months, or maybe every four months. When she was there, they did not stay in the house. They stayed in one of the outbuildings on the property.

She testified that she was always home with her children, except on Saturday nights when she stayed with her boyfriend.  Her mother is the only person she would leave her children with.  She denied leaving her children with May or Junkert.  To her knowledge, her mother never left them with May or Junkert.  Cannon denied going somewhere with May and leaving her children at home with Junkert, saying "[t]hat's never happened."  When counsel pressed, asking if she and May went anywhere together and left "anybody else" at the house with her children, Cannon replied, "No, ma'am. Not that I can recall."  At times, she picked up May and took him to her home without Junkert.  She testified that, "Most every time they were at the house, they were there with my mom."  Counsel asked, "So usually, when William and Roger were there at the house, they were there with your mom but you weren't there, fair?"  Cannon responded with "fair enough."

Cannon explained that her sister lived at the house, along with her three children, from possibly January 2019 until possibly August 2019.  Cannon thinks the photo was taken in June 2019.  She explained that one night her sister was there when Cannon left the house, but she was not there when Cannon got home.

Mary Rainey testified that she owns the house where the photo was taken.  She explained that from late April until late May 2019, she was in Port

Aransas. While she was gone, her daughter Kimberly stayed in her bedroom. When she came back home, Rainey slept in the living room because her daughter was still in her room. She explained that May, her nephew, did not have a car or a driver's license. May rode with Junkert. May visited her at her house but usually stayed in the shed, not in the house. There was, however, one night in early June when Kimberly went out and Kimberly allowed May and Junkert to stay in Rainey's room. That night Rainey and her grandchildren slept on the living room floor. Cannon was not home that night. Kimberly's children were with their dad. Rainey testified that "there was nobody else with me but Roger and Will was there." She believes the photo was taken that night.

*Defense's Explanation*

William Junkert testified that May is his fiancé, and he loves him, although he denied lying to protect May. Junkert was at Rainey's house many times, and sometimes May was not there with him. He said that he and other people in the house did a lot of meth. He explained that there were times when May left with someone, leaving Junkert there with the children. May and Cannon, or May and Rainey, would go get methamphetamines or marijuana.

Junkert testified that, on the day the photo was taken, he was in Rainey's bedroom. He used methamphetamines either late the night before or

earlier that morning, and then he and May "messed around." After that, he testified, he went to sleep, and May went outside to work on a fence. Because he was asleep, he does not know when C.R. got in bed with him or how he came to be in bed with him. He later testified that when he woke up, C.R. was on the bed right next to him. Junkert testified that May was outside when he woke up. At that point he jumped up, went outside, and told May that he was going to the store. He testified that he went to Family Dollar sometime in the afternoon. He received the text message with the photo from May's phone when he went to the store. He said he did not know who took the photo of him with C.R. However, he testified that May had no involvement whatsoever.

Junkert explained that sometimes he sleeps in his glasses. He explained that, although his eyes are open in the picture, he was asleep. He stated that he can talk, and even have sex, while asleep. He's done it several times. Junkert did not notice that the person in bed with him was not May.

Jonathan May, May's brother, testified that he has been at Rainey's house when Junkert was there and May was not.

*Johnny Frost*

Cannon explained that her childhood friend, Johnny Frost, stayed at her house for two weeks in 2017 when he got out of prison. She claimed that Frost was never at her house when she was not there. One time, in 2017, she and

Frost took May and Junkert to Junkert's mother's house. That was the only time May and Junkert were around Frost. She did not see Frost at all between 2017 and 2020, which includes the time period the photo was believed to have been taken. Frost is now deceased.

Rainey testified that she met Frost once. She said he was at her house during the month she was gone. He was there when she got home at the end of the month of May. She talked to Frost, and he left. Frost never spent the night, and May and Junkert were not there when Frost was there. She later testified that, since she was not there, she did not know whether Frost was at her house during the time she was gone. Rainey stated that Frost would "dub pictures for Roger." She explained, "That means, look on his Facebook and you'll see the difference in the picture he took and the picture he made look good." Counsel then asked if Frost liked to make pictures look better. Rainey said she did not know.

Junkert testified that he was at Rainey's house at the same time Frost was there. He specifically remembers that Frost "was there when [he] woke up." Before Junkert went to sleep, May's phone was lying next to the bed on the charger. Junkert testified that when he woke up, Frost had May's phone in his hand. Junkert assumed Frost took the photo with May's phone. Then, Junkert testified, Frost sent the text message from May's phone to Junkert's.

He also testified that the photo could have been taken by Frost on someone else's phone. Junkert explained that May's phone was unlocked when Frost got it. Junkert knows the passcode to May's phone. He said he had gone through the phone and had turned off the lock, "turned it to like 30 minutes." When questioned by the prosecutor, he admitted he does not know how long he was asleep, so he does not know if the phone was still unlocked when he woke up.

Junkert testified that he had conversations with Frost about the photo. According to Junkert, Frost shared the photo with Junkert, but Junkert did not know if Frost shared it with anyone else. Junkert was afraid of what Frost was going to do with the photo.

May's twin brother, Jonathan, testified that he had been at Rainey's house in the spring and summer of 2019. Jonathan said he was there when May, Junkert, and Frost were there. He claimed that Frost was around there during that time.

*Personal Circumstances*

Cannon denied that drugs interfered with her life, saying she only smokes marijuana on an occasional basis, and she has never done any other drugs. She admitted that her mother has used methamphetamines, but not in

front of Cannon's children. Cannon testified that she has had ten open Child Protective Services cases, but she would not classify that as trouble.

Rainey admitted that she used methamphetamines frequently in 2019. She said she never "used anything" in front of the children. She also admitted to going to jail in 2021 for possession of marijuana.

*Application of Standard of Review*

Cannon and Rainey testified that May and Junkert did not ordinarily stay in the house. However, they each identified one night when Kimberly allowed May and Junkert to stay in Rainey's room. Cannon was not home that night, and Rainey was asleep. As the sole judge of the credibility of the witnesses, the jury could have believed this explanation of May's and Junkert's access to C.R. *See Brooks*, 323 S.W.3d at 899.

Rainey testified that she believed the photo was taken one night in early June 2019. This would have been impossible in light of Kiser's testimony that the screenshot of the photo was taken on April 30, 2019. However, the jury was responsible for resolving conflicts in the testimony and could infer that Rainey misremembered the date, especially in light of her admitted drug use. *See Hooper*, 214 S.W.3d at 13. As sole judge of witnesses' credibility, the jury could reject May's theory that Cannon and Rainey were simply not credible witnesses due to their drug use. *See Brooks*, 323 S.W.3d at 899. Likewise, as

the sole judge of weight to be given to a witness's testimony, the jury could determine that Cannon's interactions with Child Protective Services were immaterial to the question of May's guilt. *See id.*

Cannon said she would never leave her children with May or Junkert. She said Junkert was never at the house without May. Although Junkert and Jonathan testified that, at times, Junkert was at the house when May was not there, the jury could have chosen not to believe them. *See id.* Further, even if true, that is not inconsistent with the explanation that both were there on the night the photo was taken. Additionally, and significantly, Junkert testified that May was there the night the photo was taken.

Critical to the verdict is the evidence concerning Johnny Frost. Cannon said May and Junkert were around Frost only once. While Jonathan testified that Frost was at Rainey's house during the spring and summer of 2019, Cannon testified that she did not see Frost at all during that time period. Rainey testified that Frost was there once at the end of May, but he never spent the night, and May and Junkert were not there when Frost was there. Again, the jury could have disbelieved Jonathan and determined that either Cannon or Rainey was mistaken about the date Frost was in their home. *See id.* Still, the jury was not required to believe that meant Frost was there when the photo was taken. It is the jury's responsibility to draw reasonable inferences from

basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. The jury could have determined that was not a reasonable inference.

On the other hand, May's defense was presented through Junkert's testimony that Frost was in the room when he woke up with C.R. beside him, and Frost was holding May's phone. The jury could have rejected Junkert's testimony that Frost was there, as well as his explanation about the phone being unlocked. *See Brooks*, 323 S.W.3d at 899. Furthermore, the jury could have discounted Junkert's testimony because he said he received the text containing the photo while at Family Dollar in the afternoon. The jury had previously heard Kiser's testimony that the text containing the photo was sent to Junkert's phone at 1:34 a.m., not p.m. The jury could resolve that conflict against the defense. *See Hooper*, 214 S.W.3d at 13.

The record shows that May was at Rainey's house when the photo was taken. The photo shows May's nine-year-old family member on a bed with May's fiancé while the fiancé engaged in sexual contact with the child. A screenshot of the photo was on May's phone and sent by text to Junkert's phone on April 30, 2019. The cumulative force of all of the incriminating circumstances is sufficient to support the convictions for trafficking of persons and sexual performance by a child. *See* TEX. PENAL CODE ANN.

§§ 20A.02(a)(7)(B), 43.25(b); *Hooper*, 214 S.W.3d at 13.  We overrule May's first and second issues.

**EXTRANEOUS OFFENSE EVIDENCE**

In his third issue, May asserts the trial court abused its discretion in refusing to exclude extraneous offense evidence.  He complains that the trial court erred by admitting evidence of photos of a young boy, not the victim in this case, found on his phone.

## Standard of Review

We review the trial court's decision to admit contested testimony under an abuse of discretion standard.  *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).  We will uphold the trial court's decision if it is within the zone of reasonable disagreement.  *Id*.  The trial court's evidentiary ruling must be upheld if it is correct under any applicable theory of law.  *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

## Applicable Law

Because an accused must be tried only for the offense for which he is charged and may not be tried for a collateral crime or for being a criminal generally, extraneous offense evidence is usually not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  TEX. R. EVID. 404(b)(1); *Stafford v.*

*State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991). However, in prosecutions for sexual offenses against children under the age of seventeen Texas Code of Criminal Procedure article 38.37 permits the admission of evidence concerning specified extraneous offenses committed by the defendant against a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37. The unique nature of sexual assault crimes justifies admitting extraneous offense evidence. *See Jenkins v. State*, 993 S.W.2d 133, 136 (Tex. App.—Tyler 1999, pet. ref'd).

Article 38.37, Section 2(b) provides that:

Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to Section 2-a, evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2) may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b). Subsection 2(b) applies to specified offenses. *See id.* art. 38.37, § 2(a)(1).

When evidence of a defendant's commission of one of the offenses listed in article 38.37, section 2(a) is relevant under article 38.37, the trial court must conduct a Rule 403 balancing test upon proper objection or request. *West v. State*, 554 S.W.3d 234, 239 (Tex. App.--Houston [14th Dist.] 2018, no pet.). Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Pursuant to Rule of Evidence 403, the trial court must weigh the probative value of the evidence against the potential for unfair prejudice. TEX. R. EVID. 403.

"Probative value" is the measure of "how strongly [the evidence] serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). Unfair prejudice refers to a "tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641.

When a trial court conducts a Rule 403 balancing test, it must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that

presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Id*. at 641-42.

**Analysis**

Kiser, the forensics computer examiner, testified that the Johnson County investigator told him she was looking for photos of a juvenile undressing. He found thirteen images he believed she was referring to. He also found the photo of C.R. and an image that appears to be little snapshots of child pornography, "but it's too small to really delineate whether it was children or not." Those small pictures are known as thumbnails.

May contends there was no probative value from the extraneous offenses, and if there was, it was outweighed by the extremely prejudicial information. He contends the extraneous offense evidence did not compellingly make a nexus more probable because it was vague and generalized. Finally, he argues the evidence impacted the jury in an irrational way.

The first factor we consider is the inherent probative force of the extraneous offense testimony. Because evidence of separate sexual offenses is probative on the issues of intent and a defendant's character or propensity to commit sexual assaults on children if sufficient evidence is provided regarding the extraneous offense, the probative value of sexual offenses committed against other children is generally not substantially outweighed by the danger

of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *Deggs v. State*, 646 S.W.3d 916, 925 (Tex. App.--Waco 2022, pet. ref'd). Here, evidence that other pornographic images were on May's phone is highly probative of his character or propensity to cause children to engage in sexual contact, conduct, or performance. *See Deggs*, 646 S.W.3d at 926; *Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.).

The second factor, the State's need for the evidence weighs in favor of admission. There was no direct evidence of May's involvement. Thus, additional circumstantial evidence increases the cumulative force of evidence and is needed "for any bearing the evidence has on relevant matters." *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b).

With respect to the third factor, we recognize the inherently inflammatory and prejudicial nature of evidence of extraneous acts and misconduct involving children does tend to create the potential for a verdict on an improper basis. *See Deggs*, 646 S.W.3d at 926. However, the additional images were thumbnails, rather than full size, and Kiser testified that they were too small to determine if they depicted children. Also, the State offered a relatively small number of images. *See Cox v. State*, 495 S.W.3d 898, 908-09

(Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (comparing the prejudicial effect of 10,000 pornographic images to the prejudicial effect of 2,000 pornographic images, in relation to the State's need to present the evidence).

Regarding the fourth factor, we consider whether there was a tendency of the evidence to confuse or distract the jury from the main issue in this case. Just prior to Kiser's testimony, the trial court instructed the jury that they cannot consider the extraneous offense testimony for any purpose unless they find beyond a reasonable doubt that May committed the other offenses. The court further instructed the jury that it may only consider the extraneous offense evidence in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident of May, in connection with the offense alleged against him in the indictment and for no other purpose. That limiting instruction was also included in the jury charge. Additionally, the charge included the article 38.37 instruction that the extraneous offense evidence may be considered if the jury believes beyond a reasonable doubt that May committed such other offenses, and then it may consider said evidence for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. Then the trial court identified the elements the State was required to prove by its indictment, thereby redirecting the jury

to the main issues in the case. The jury instructions mitigated the tendency of the extraneous offense evidence to confuse or distract the jury. We find the fourth factor weighed in favor of admission.

The fifth factor refers to evidence such as highly technical or scientific evidence that might mislead the jury because it is not equipped to weigh the probative force of the evidence. *See Gigliobianco*, 210 S.W.3d at 641. Here, while Kiser's testimony explaining how he extracted the photos is highly technical, the photos themselves do not require special expertise to consider and weigh their probative force. We find the fifth factor weighed in favor of admission.

As to the sixth factor, the extraneous offense direct testimony was presented in approximately five pages of testimony. We find the presentation of the extraneous offense evidence did not consume an inordinate about of time. The last factor favored admission.

We find that the trial court, after balancing the Rule 403 factors, could have reasonably concluded the probative value of the extraneous offense evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Deggs*, 646 S.W.3d at 927. We find that the trial court did not abuse its discretion in admitting the extraneous offense evidence. *See Walters*, 247 S.W.3d at 217. Therefore, we overrule May's third issue.

## CONCLUSION

The trial court did not err in admitting extraneous offense testimony. Further, the evidence is sufficient to support May's convictions for trafficking of persons and sexual performance by a child.

We affirm the trial court's judgment.

_____
STEVE SMITH
Justice

OPINION DELIVERED and FILED:  August 14, 2025

Before Chief Justice Johnson,
     Justice Smith, and
     Justice Harris
Affirmed
Do not publish
CR25

